UNITED STATES of America,

v.

**Nduche Chima UWAEZHOKE a/k/a Andy, Appellant.**

No. 91–5589.

United States Court of Appeals, Third Circuit.

Argued March 5, 1992.

Decided May 6, 1993.

Sur Petition for Rehearing June 11, 1993.

Michael Chertoff, U.S. Atty., Glenn J. Moramarco (argued), Asst. U.S. Atty., Newark, NJ, for appellee.

Raymond A. Brown, Alan D. Bowman (argued), Brown & Brown, Newark, NJ, for appellant.

Before: STAPLETON and MANSMANN, Circuit Judges, and POLLAK, District Judge *.

### OPINION OF THE COURT

STAPLETON, Circuit Judge.

This appeal challenges the conviction of Nduche Chima Uwaezhoke. Mr. Uwaezhoke, who is black, was charged, together with one Tony Butts, with four counts of heroin importation and related conspiracies. Mr. Butts pleaded guilty to one count of the indictment. Mr. Uwaezhoke went to trial. Mr. Butts was a principal witness at the trial, which resulted in a jury verdict of guilty on all four counts. Mr. Uwaezhoke was sentenced to concurrent terms of 216 months on each of the four counts.

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

The sole question presented by Mr. Uwae-zhoke's appeal is whether, in the course of jury selection, the prosecution exercised one of its peremptory challenges in a racially discriminatory way, in contravention of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

### I.

■ Appellant had ten peremptory challenges and exercised all of them. The government had six peremptory challenges and exercised two. The first of the government's peremptory challenges was directed at venireperson 324, Douglas Bath, a single unemployed male carpenter; the record contains no concrete evidence with respect to Mr. Bath's ethnicity, but since Mr. Uwae-zhoke has not complained about the striking of Mr. Bath, it seems a fair inference that Mr. Bath was not black. The second of the government's peremptory challenges was directed at venireperson 169, Kim R. Lucas, a black woman residing in Newark, New Jersey, who had appeared in the jury box as a replacement for the panelist who was the object of Mr. Uwaezhoke's ninth peremptory challenge. The record shows the following exchange with respect to the striking of Ms. Lucas:

THE CLERK: Juror 3, 169, Kim R. Lucas.

THE COURT: Yes, Miss Lucas.

PROSPECTIVE JUROR NO. 3: A, five years. B. I'm a postal employee. I've been there four years. Not married. Single parent, two small children at home. I rent, aerobics, I cut hair, and I take tennis lessons. High School. I have a license in cosmetology and I go to college.[1]

THE COURT: And did you hear the questions that I asked the other jurors? [2]

PROSPECTIVE JUROR NO. 3: Yes.

THE COURT: Is your answer yes to any of them?

PROSPECTIVE JUROR NO. 3: No.

THE COURT: All right. Thank you very much. Mr. Tannenbaum.

MR. TANNENBAUM: The United States would request that Juror 3 be excused.

THE COURT: All right, Miss Lucas, thank you very much.

MR. BROWN: I want to be heard at sidebar, if your Honor please.

THE COURT: All right.

(The following occurs at sidebar.)

THE COURT: Yes.

MR. BROWN: Your Honor, this is obviously racial. I wanted to make a challenge. People sat in that seat time and again. Everyone was approved. The moment a black sits down there is a targeted thrust at that particular person.

I realize that it's peremptory, but I understand that under your rules, the Supreme Court ruled that if there is an indication of racial selectivity, that that is illegal and is to be prohibited. That was as clear as a bell.

THE COURT: Mr. Tannenbaum, what was the basis for the challenge?

MR. TANNENBAUM: We challenged her because it's a general policy. She was a postal employee, and we usually don't like

---

1. The jurors responded to questions from a sheet of paper left on the jurors' chairs. The questions ask how long the juror has lived at the juror's present residence, what is the juror's occupation, how long has the juror been at his or her present job, who is the juror's spouse and what is the spouse's occupation, who are the juror's children and what are their occupations, does the juror rent or own his or her place of residence, what are the jurors hobbies and activities, what is the level of the juror's education and what degrees does the juror hold.

2. The district judge had asked everyone in the jury pool these questions: Do you know any of the participating attorneys or the defendant? Have you ever served on a jury before? Have you ever been the victim of a crime, or participated as a witness in a criminal trial? Have you heard anything about this case? Do you have any police officers in your family? Do you have any dealings with the U.S. government, any contracts with or claims against the U.S. government? Do you have any problem with the use of tape recorded conversations as evidence? Do you have any medical problems that would prevent you from wearing headphones? Have you ever had any problem with drugs, have you or anyone close to you been addicted to drugs? Will it affect your judgment that the defendant, although a U.S. citizen, is from Nigeria?

to have postal employees on the jury. It has nothing to do with any racial—

MR. BROWN: Judge, I've tried cases in this courthouse for a long time. If that is a new policy to challenge postal authorities, that is a brand new policy.

As a matter of fact, the practical approach has been that these people favor the federal government because they are employed by them. But to say that there is a policy to challenge postal employees—

THE COURT: Are you stating?

MR. REPETTO: It's not a policy.

MR. TANNENBAUM: No, it's not a policy per se.

MR. BROWN: I would like to have what he said read back.

THE COURT: No. Mr. Repetto?

MR. REPETTO: We have a black juror that has been on from the initial panel. Nobody challenged her.

THE COURT: I want to know why you challenged this particular juror.

MR. REPETTO: This particular juror is employed by the Postal Service. There is a problem with Postal Service jurors in these kinds of cases. It is a person that is a single parent, it's also a person that rents, it's a person that may be involved in a drug situation where she lives.

There is a lot going to this other than the fact that she is black, and there is a black juror on that nobody touched.

MR. BROWN: That's the point.

THE COURT: I'm going to accept the government's explanation.

MR. BROWN: But, Judge, I challenge the concept that postal workers—

THE COURT: Other reasons were given. We'll stand on the record.

MR. BROWN: There were no other reasons. The neighborhood?

THE COURT: The record will speak for itself.

MR. BROWN: Yes, it shall, and I want to go on the record objecting and asking for a mistrial based upon a deliberate use of a prejudice and racial challenge.

THE COURT: I will note that Juror No. 4 is black and has not been challenged throughout.

MR. BROWN: But that's not the standard. The standard is why is someone challenging for racial reasons. The answer that there is a policy, and I remember the word—

THE COURT: But it was expanded upon by Mr. Repetto. All right, yes. Motion denied. (End of sidebar discussion.)

Supp.App. 52–55.

As the quoted colloquy indicates, the government advanced two reasons for challenging Ms. Lucas. The first, advanced by prosecutor Tannenbaum, was that the United States Attorney's Office had a policy favoring the exercise of peremptory challenges in drug cases to exclude anyone who was a postal employee. The second, advanced by prosecutor Repetto, was that Ms. Lucas' personal circumstances (i.e., those of a single parent living in a rental property in the city of Newark who was supporting herself and two children on the income of a postal worker with four years' tenure) suggested to the government that she "may be involved with a drug situation where she lives." As we read the trial transcript, the judge was as incredulous as Mr. Brown about the existence of a policy excluding postal workers, per se, but accepted the "other reasons [that] were given." Thus, it was the Repetto explanation which the district court found to be the one that actually motivated the government's challenge of Ms. Lucas.

The district court, in accepting the government's peremptory challenge, found that the reason for the government's challenge was a race-neutral one and that this race-neutral reason was not a mere pretext for racial discrimination. We find that the government's explanation for excusing the juror was not facially invalid as a matter of law, and that the district court was not clearly erroneous in finding an absence of actual discriminatory intent. We will affirm the district court's ruling and Mr. Uwaezhoke's conviction.

## II.

Recently, in the plurality opinion in *Hernandez v. New York,* —— U.S. ——, ——
——, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991), Justice Kennedy summarized the process prescribed by *Batson* that is to be followed in a criminal case when defense counsel raises a *Batson* challenge to the prosecutor's exercise of a peremptory challenge:

> In *Batson,* we outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause.... First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.... Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.... Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

### A.

■ This court has underscored the importance of the first step of the three-step *Batson* process. In *United States v. Clemmons,* 892 F.2d 1153, 1156 (3d Cir.1989), we held that the

> *Batson* Court contemplated that the traditional peremptory challenge process would not be intruded upon absent some reason to believe that discrimination might be at work.... Accordingly, district courts should expressly address the prima facie issue before requiring an explanation from the prosecutor.

While we continue to stress the importance of the first step of *Batson,* we note that any issue regarding the existence of a prima facie showing of discrimination becomes moot where, as in this case, the prosecutor offers an explanation of the peremptory challenge before the district court has "expressly address[ed] the prima facie issue". In so holding, we follow the conclusion of the plurality in *Hernandez* that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." —— U.S. at ——, 111 S.Ct. at 1866. If the government is found at any subsequent stage of the case either to have tendered an explanation that is not race neutral or to have acted with racial animus, the conviction must be overturned without regard to whether the defendant established a prima facie case.

### B.

■ In the second step of the *Batson* process the government must offer an explanation for the peremptory challenge that is race-neutral. As the *Hernandez* plurality observed, "[i]n evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause *as a matter of law.*" —— U.S. at ——, 111 S.Ct. at 1866 (emphasis added).[3]

The *Hernandez* plurality articulated the relevant legal issue at this stage as follows:

> A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. —— U.S. at ——, 111 S.Ct. at 1866.

Thus, if the government's explanation does not, on its face, discriminate on the basis of race, then we must find that the explanation passes *Batson* muster as a matter of law, and we pass to the third step of *Batson* analysis to determine whether the race-neutral and facially valid reason was, as a matter of fact, a mere pretext for actual discriminatory intent.

---

3. See also *United States v. Johnson,* 941 F.2d 1102, 1108 (10th Cir.1991) (whether the prosecutor's explanation is race neutral is a question of law).

In determining whether the government has satisfied the requirements of *Batson* at the second step, we must keep firmly in mind that *Batson's* holding rests squarely on the Equal Protection Clause. Equal Protection jurisprudence thus governs our determination of whether the appellant has a *Batson* claim. Under that jurisprudence, this court may remedy only those acts of racial discrimination that are intended by the government. The Supreme Court has repeatedly held that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact ... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); see also, *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Intention to unlawfully discriminate is thus an essential element of a *Batson* violation.

■ This means that an explanation which is otherwise racially neutral on its face is not infirm solely because its repeated application would have a disparate impact on a particular racial group—that is, would result in the exclusion of more members of one racial group than members of other racial groups. If the government's explanation, generally applied, would have a disparate impact on a particular racial group, this fact should cause a trial judge to exercise special scrutiny during the third step of the *Batson* process to determine whether intentional discrimination, as a matter of fact, underlies the government's peremptory challenge.[4] Indeed, a trial judge may be justified in concluding at that stage that discriminatory intent has played a role in the challenge when the disparate impact is great and any legitimate

concern of the prosecutor slight. But the role of disparate impact in the *Batson* analysis is as circumstantial evidence of discriminatory intent at the third stage and not as a controlling legal factor at the second.

The government here claims that, because of Ms. Lucas' likely place of residence, she was more likely to have had direct exposure to a drug trafficking situation than other potential jurors as a class and that the government could legitimately prefer to assume the least risk of a juror having had such an exposure. Whether or not one accepts this explanation as an accurate description of the government's motivation in challenging Ms. Lucas, it is clearly race-neutral on its face.

The prosecutors, at the time they exercised the peremptory challenge, knew that Ms. Lucas was a single parent of two children who was making the salary of a postal worker with four years of seniority and renting an apartment in Newark, New Jersey. It is, we believe, fair to infer that the prosecutors, in the absence of any more detailed information concerning Ms. Lucas, speculated that she might live in low income housing in Newark. Having so speculated, the prosecutors inferred that Ms. Lucas was more likely to have had direct exposure to drug trafficking than someone who did not live in low-income housing in Newark. While this conclusion may or may not be empirically correct, we cannot say that it exhibits racially discriminatory intent as a matter of law. Finally, the prosecutors concluded that if they had their preference (as they did so long as they retained a peremptory challenge), they would rather not have jurors who have had personal experience with drug trafficking. While neither the district court nor the defense attorney pressed the prosecutors to spell out their reasoning, it is possible that the prosecutors may have wanted to

---

4. We mean by this only that the existence of a disparate impact on a particular racial group may constitute very probative circumstantial evidence of racial animus and, like any such evidence, should cause the trial judge to examine the contrary evidence with care. We do not mean to suggest that existence of a disparate impact alters the legal standard the trial judge should apply in determining whether a constitutional violation has occurred. Nor do we suggest that where, as here, no one has relied upon

the alleged disparate impact of a tendered explanation, the trial judge has a duty to stop in the middle of the *voir dire* and consider whether the tendered explanation may have such an impact. We cannot fault the trial judge in this case for not expressly addressing the possibility of a disparate impact. Being unable to fault his original performance, we perceive no reason to remand this case and insist that he go through the *Batson* process again.

avoid jurors with direct drug experience for any number of legally legitimate reasons, the most likely of which is a concern that a personal experience may have left a strong impression on the juror, thus influencing her evaluation of the evidence in a way difficult for the prosecutors to predict.[5]

While it is certainly conceivable, as Mr. Uwaezhoke suggests, that the prosecutor took one look at Ms. Lucas' color and thought, "Blacks who live in poor neighborhoods cannot be trusted to fairly enforce drug laws against other blacks", it is equally possible that the prosecutor concluded that anyone, regardless of color, who lives in a poor neighborhood in Newark may have had personal experience with drug trafficking that would make their reaction to trial evidence unpredictable. We cannot find that discriminatory intent was inherent on the face of the government's explanation, and so we hold that the explanation is valid as a matter of law. If there was actual racial discrimination lurking behind this explanation, it can be found only as a matter of fact.

### C.

■ Turning to the third step of our *Batson* analysis, we must ask whether the district court erred in finding that the government's facially valid explanation for the peremptory challenge was not, as a matter of fact, a mere pretext for discriminatory intention. The district court found that there was no discriminatory intention, and we review that finding to determine if it was clearly erroneous. *United States v. Casper*, 956 F.2d 416, 419 (3d Cir.1992). We must accept the factual determination of the district court unless that determination "either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data," *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 92 (3d Cir.1992), quoting *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir.1972).

We find credible record evidence that logically supports the district court's determination that the government had no intent to discriminate against black jurors. As we have indicated, prosecutor Repetto tendered to the district court a racially neutral explanation that was plausible. Moreover, as the trial judge noted at the time, this explanation was buttressed by the fact that the government had earlier had repeated opportunity to challenge the black juror who in fact served on Mr. Uwaezhoke's jury, and declined to do so. We acknowledge that Repetto's explanation would have been more credible if the government's far less plausible alternative explanation had not been advanced. We also acknowledge that Repetto's explanation, if generally applied, would be likely to have a disparate impact on blacks in the vicinage and, accordingly, is one that should be scruti-

---

5. A prosecutor may rationally believe, for example, that a juror living in a neighborhood with a drug problem may fear retaliation from dealers there if she votes to convict an alleged drug trafficker or may have had an unpleasant contact with the police in the context of drug trafficking.

We do not, of course, suggest that the information available to the government would support a finding that Ms. Lucas, more probably than not, would be an unqualified juror, or even an undesirable juror from the government's point of view. But that is not what peremptory challenges are all about. A primary reason for their existence is that it is not feasible for lawyers to know much about individual jurors. Counsel must rely on educated guesses about probabilities based on their limited knowledge of a particular juror and their own life experiences. If a lawyer can show some specific conflict between information about a particular juror and the particular case to be tried, he or she is in a position to make a challenge for cause. Peremptory challenges are intended for those situations in which counsel cannot demonstrate such a specific conflict, but has some reason to believe a prospective juror *may* be less desirable from his or her perspective as contrasted with other jurors likely to be called in the event of a peremptory challenge.

We can find nothing in the plurality opinion of *Hernandez* that suggests that the prosecutor must offer a nexus between a particular juror and the particular case that tends to demonstrate the juror would be unable to fairly evaluate the evidence; the opinion merely notes that the facts before it presented the question of how the absence of such a nexus would affect the determination of a *Batson* violation. We thus disagree with the Ninth Circuit's view that *Hernandez* "strongly suggests" that a nexus between particular juror and the facts of the case must exist in order for the prosecutor's explanation of a proposed challenge to be facially valid. *United States v. Bishop*, 959 F.2d 820, 825 (9th Cir. 1992).

nized with care. We are unwilling to hold, however, that these facts, singly or together, required the district court to reject Repetto's explanation. The trial judge was far better situated than we to determine whether that explanation was fact or pretext. He concluded that it was fact, and we cannot fault him for doing so.

The conviction of the appellant will be affirmed.

LOUIS H. POLLAK, District Judge, dissenting.

### I.

In the United States Courthouse in Newark, New Jersey, in the course of jury selection for the trial of Nduche Chima Uwaezhoke on charges involving the importation and planned distribution of heroin, the government undertook to use one of its peremptory challenges to unseat prospective Juror No. 3, Kim R. Lucas. Ms. Lucas, like Mr. Uwaezhoke, is black. Raymond A. Brown, Esq., Mr. Uwaezhoke's attorney, objected that the peremptory challenge was keyed to Ms. Lucas' race, in contravention of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The district court asked government counsel to explain the grounds for its peremptory challenge of Ms. Lucas. Jason W. Tannenbaum, Esq., and Bruce Repetto, Esq., the Assistant United States Attorneys representing the government, identified two grounds for the challenge:

*First*, Mr. Tannenbaum said:

We challenged her because it's a general policy. She was a postal employee, and we usually just generally don't like to have postal employees on the jury. It has nothing to do with any racial—

Appellee's Supp.App. at 53. In further colloquy the government seemed initially to backtrack: Mr. Repetto said that "[i]t's not a policy;" and Mr. Tannenbaum said that "it's not a policy per se." *Id.* at 54. But, when pressed by the district court, Mr. Repetto went on to say:

This particular juror is employed by the Postal Service. There is a problem with Postal Service jurors in these kinds of cases.

*Id.*

*Second*, Mr. Repetto then added:

It is a person that is a single parent, it's also a person that rents, it's a person that may be involved in a drug situation where she lives.

There is a lot going to this other than the fact that she is black, and there is a black juror on that nobody touched.

*Id.*

When Mr. Brown renewed his objection, the district court said: "I'm going to accept the government's explanation." *Id.* Mr. Brown objected again: "Judge, I challenge the concept that postal workers—," to which the district court responded: "Other reasons were given. We'll stand on the record." *Id.* at 54–55. Mr. Brown persisted. The district court said that "[t]he record will speak for itself." *Id.* at 55. Mr. Brown moved for a mistrial. *Id.* The district court noted "that Juror No. 4 is black and has not been challenged throughout." *Id.* Mr. Brown again referred to the government's invocation of a "policy." *Id.* And the district court replied: "But it was expanded upon by Mr. Repetto. All right, yes. Motion denied." *Id.*

Mr. Uwaezhoke was found guilty by the jury on each of the four drug counts with which he was charged; he was thereafter sentenced to a lengthy prison term.

### II.

In appealing the judgment of conviction, Mr. Uwaezhoke has assigned but one error—the district court's rejection of his *Batson* claim. Mr. Uwaezhoke contends that both of the government's stated grounds for striking Ms. Lucas—her status as a postal worker, and Mr. Repetto's conjecture that Ms. Lucas "may be involved in a drug situation where she lives"—are pretextual: i.e., flimsy camouflage for Ms. Lucas' race.

This court upholds the district court's *Batson* ruling. The court's judgment of affirmance rests upon two intermediate conclusions:

The *first* conclusion is that, "[a]s we read the trial transcript, it was the Repetto explanation [that Ms. Lucas 'may be involved in a drug situation where she lives'] which the district court found to be the one that actually motivated the government's challenge of Ms. Lucas." Supra at 391.

The *second* conclusion is that the district court, by acquiescing in the government's challenge of Ms. Lucas, made a finding, which is not clearly erroneous, that the Repetto explanation was not pretextual.[1]

I dissent because I find both conclusions troublesome. Believing that neither the correctness nor the incorrectness of those two conclusions can be confidently demonstrated on this record, I am persuaded that the case should be remanded to permit the district court to amplify its findings.

I turn now to an explanation of why, in my judgment, the two conclusions are troublesome.

### A.

(1) *Was the "Repetto explanation" the only ground for striking Ms. Lucas?*

As I have pointed out, this court finds, on the basis of its reading of the trial transcript, that the district court concluded that the government, in striking Mr. Lucas, was only relying on the "Repetto explanation"—that Ms. Lucas "may be involved in a drug situation where she lives"—and not on the Tannenbaum postal-worker explanation.

The court's reading may be correct. But—given that Mr. Repetto, while recharacterizing Mr. Tannenbaum's explanation, elected not to disavow it but simply to add his own explanation—I am of the view that the transcript is at least as consistent with the inference that the district court accepted the two explanations in combination, Mr. Tannenbaum's explanation having been "expanded upon by Mr. Repetto."

(2) *Why it matters whether the postal-worker explanation also played a part in the striking of Ms. Lucas*

It matters a good deal whether the Tannenbaum postal-worker explanation was or was not relied on in some measure by the district court. The court's conclusion that the district court found that the Repetto explanation was "the one that actually motivated the government's challenge of Ms. Lucas," has freed the court from assessing the legality of the postal-worker explanation.

Because I do not share the court's confidence that the postal-worker explanation was given no weight by the district court, I am obligated to address the question whether the postal-worker explanation is incontestably viable as a matter of law. If the answer to that question is in the affirmative, then it would not matter if the district court did deem the postal-worker explanation to be part of the government's aggregate rationale in striking Ms. Lucas—assuming, of course, that the government's other explanation is legally viable, a question to be separately addressed. But if the postal-worker explanation is deficient as a matter of law, or if the question of its legal sufficiency may turn on factual findings that the district court has not articulated, then I would think that our proper course would be to remand this case to the district court so that it could determine whether it gave weight to the postal-worker explanation and, if so, why.

---

1. I have no quarrel with—on the contrary, I agree with—the analytic scenario utilized by the Court in examining the legal viability of a proffered explanation for a prosecutorial peremptory challenge. The applicable scenario, prescribed in *Batson* and reaffirmed in *Hernandez v. New York*, — U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion) (citations omitted), is as follows:

In *Batson*, we outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause.... First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at ——-——, 111 S.Ct. at 1865–66.

In the present case, as the court explains, the requirement of a prima facie showing that the challenge to Ms. Lucas was racially based was mooted by the district court's asking the government to explain the grounds for the challenge.

I turn, then, to the question of the legal viability of the postal-worker explanation. There would appear to be no question that the explanation is, on its face—i.e., confining judgment to the four corners of verbal utterance—race-neutral. "Once the prosecutor offers a race-neutral basis for his exercise of peremptory challenges, '[t]he trial court then [has] the duty to determine if the defendant has established purposeful discrimination.' *Batson,* 476 U.S., at 98, 106 S.Ct., at 1723–24.... If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination." *Hernandez,* —— U.S. at ——, 111 S.Ct. at 1868.

The record before this court does not lend itself to a confident answer to the question whether the exclusion of postal workers from serving as jurors in criminal trials in the federal courthouse in Newark would bear more heavily on blacks than non-blacks. Part of the difficulty is that we have no way of knowing, from the statements of Messrs. Tannenbaum and Repetto in the district court, whether the proposed exclusion of postal workers focuses on Newark, Ms. Lucas' residence, or extends to the entire jury catchment area of the Newark federal courthouse.

Getting a handle on the statistical implications of the latter scenario is not easy, because we lack complete information. The Newark federal courthouse's jury catchment area consists of seven northern-tier New Jersey counties—Bergen, Essex (in which Newark is located), Hudson, Morris, Passaic, Sussex and Union. According to the 1990 census, the aggregate population of these seven counties is slightly more than 3,000,000, of which number about 600,000—approximately one-fifth—are black. *1990 Census of Population: General Population Characteristics, New Jersey, Section 1* (1992) pp. 23–25. Unfortunately, there appear to be no readily accessible data as to the proportion of postal employees in the seven-county area who are black. However, we do know that, as of August 1992, the state-wide postal work force

numbered some 30,000, of whom 24.3%, or approximately one-fourth, were black. *U.S. Postal Service Work Force Profile* (Aug. 21, 1992). The 1990 census tells us that the total population of New Jersey is 6,130,000, of whom 1,037,000, or slightly more than one-sixth, are black. *U.S. Bureau of the Census, State and Metropolitan Area Data Book, 1991* (1991) Table E, pp. 208–09. In short, the proportion of blacks in the jury catchment area—approximately one-fifth—is slightly higher than the proportion of blacks in the state as a whole. So it seems a fair surmise that the proportion of blacks in the postal work force in the catchment area is at least as large as the proportion of blacks in the postal service state-wide—namely, approximately one-fourth. And to exclude from jury service several thousand postal workers, one-fourth of whom are probably black, who reside in a jury catchment area which is one-fifth black, would appear to work a slightly-more-than-random exclusion of blacks. The deviation from randomness is not of major dimension, but it would seem significant enough to call for some justification.

If, on the other hand, the exclusion of postal workers from federal criminal juries were to focus solely on postal workers in Newark, the target population would be smaller, but the disproportionate impact would be considerably greater: as of August 1992, 1641 out of 2512—or 65.3%—of Newark's postal workers were black. *U.S. Postal Service Minority Census Reporting System, Finance Minority Profile Consolidated Report* (City: Newark 07102–9998 (8/11/92)). Here, justification would seem imperative.

In its brief on appeal the government has proffered a somewhat tepid justification for a prosecutorial strategy of striking postal workers from federal criminal juries:

> In regard to postal employees, it is true, as Uwaezhoke argued before the district court, that postal employees are Government employees, and that some prosecutors may view them favorably for that reason. Supp.App. at 53–54. However, it is also true that all crimes committed by postal employees at the work place are federal crimes that are prosecuted by the

U.S. Attorney's Office. A prosecutor may prefer not to have postal employees on the jury because of a fear that some postal employees harbor an antipathy towards the U.S. Attorney's Office for prosecuting relatively minor, but job-related, theft and drug offenses, when similar crimes otherwise might be ignored by state and local prosecuting authorities.

Appellee's Brief at 15–16.

The government's announced justification, such as it is, was not presented to the district court, so we do not have the benefit of that court's assessment of its pertinence.

Neither the government nor the defense has identified—and I have not been able to discover—any reported federal case in which the prosecution has sought to disqualify postal workers, as a class, from jury service. There is one reported state case—a Texas case, *Tompkins v. State*, 774 S.W.2d 195 (Tex.Ct.Cr.App.1987)—involving a peremptory challenge of this sort. The *Tompkins* case is instructive.[2] *Tompkins* involved "capital murder"—a killing that occurred in the course of a robbery and kidnapping. The defendant was convicted and sentenced to death. Among the numerous issues presented on appeal was whether the trial court had erred in sustaining peremptory challenges to five black members of the venire. With respect to the fifth peremptory challenge, the Texas Court of Criminal Appeals—Texas' highest court of criminal jurisdiction—had this to say:

> The fifth black venireperson gives us great concern because the testimony reflects that that person was peremptorily struck solely, by the testimony of the prosecuting attorney who testified on this point, because he had been an employee of the United States Postal Service for some thirteen years, and not "simply because he was black."
>
> The record reflects that that venireperson expressed a certain difficulty understanding the law of causation in criminal cases, as well as the notions of "probability" and "continuing threat to society" con-

cerning the punishment issues, which understanding we find was essential in order for the juror to decide whether appellant was guilty of capital murder and, if so, whether there was a probability that appellant would thereafter commit criminal acts of violence that would constitute a continuing threat to society. However, our reading of the entire jury selection process in this case discloses widespread disagreement and uncertainty among the venirepersons, as it does in nearly every capital murder case, regarding legal definitions and concepts, which are usually alien to most venirepersons. Not surprisingly, it is not uncommon for those venirepersons to appear inarticulate, confused, and tentative under these conditions. We find that this prospective black venireperson's answers to questions asked did not indicate an inability on his part, that was any greater or less than the unchallenged venirepersons, to understand the law or to apply it impartially. This venireperson also did not indicate a bias or prejudice against any phase of the law pertinent to this case. Indeed, the State did not urge at the hearing any such basis upon which to doubt the venireperson's qualifications for jury service. As noted, the sole reason given why the venireperson was struck was that he was an employee of the United States Postal Service.

> We have some difficulty understanding the relevancy of a venireperson's employment as a postman employed by the United States Government as far as his qualifications for jury service. Although the prosecuting attorney indicated that "I have not had very good luck with postal employees," she did not elaborate upon her evident bias against such employees. Perhaps, indeed, federal postal employees share a common view of the criminal justice system antithetical to the interests of law enforcement. But if so, we are not aware of it, nor has the State undertaken to enlighten us further on the subject.

774 S.W.2d at 205.

One who had read this much of the Court of Criminal Appeals' opinion might well have

---

**2.** For leading me to *Tompkins,* I am indebted to Professor Albert W. Alschuler's valuable article, *The Supreme Court and the Jury: Voir Dire, Per-* *emptory Challenges, and the Review of Jury Verdicts,* 56 *U.Chi.L.Rev.* 153, 176 (1989).

expected that the quoted analysis presaged reversal. Not so. The court had a surprise in store:

> Notwithstanding what we have stated, we find that the prosecuting attorney's reasons that she gave constitute a racially neutral explanation, and it is not the office of this Court to judge her credibility.

*Id.*

The Supreme Court granted certiorari, limiting its review to the peremptory challenges and certain death sentence issues. With respect to the challenge to the fifth venireperson, Texas, in its brief in the Supreme Court, argued that the Court of Criminal Appeals erred in finding that the challenge was predicated on his status as a postal worker:

> Viewed in context, it is apparent that the prosecutor's statement that she had not had luck with postal employees was more in the nature of a parenthetical comment than an asserted reason for excluding Green. In finding that Green was excluded solely on the basis of his employment, the Court of Criminal Appeals ignored the reasons actually advanced by the prosecutor as well as the findings of the trial court.

*Tompkins v. Texas,* (U.S. No. 87–6405) Respondent's Brief at 29.

The Supreme Court, without opinion, affirmed by an equally divided Court, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989), a disposition without precedential weight. *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 234 n. 7, 107 S.Ct. 1722, 1730 n. 7, 95 L.Ed.2d 209 (1987); *Neil v. Biggers,* 409 U.S. 188, 192, 93 S.Ct. 375, 378, 34 L.Ed.2d 401 (1972).

Like the Texas Court of Criminal Appeals, I can posit it as a conceptual possibility that "federal postal employees share a common view of the criminal justice system antithetical to the interests of law enforcement." But in the case at bar—putting aside Mr. Repetto's observation that "[t]here is a problem with Postal Service jurors in these kinds of cases"—the government offered the district court not a single allegation of fact, whether relating to postal workers in general or Ms. Lucas in particular, that would tend to translate that conceptual possibility into an actual prosecutorial problem. And the government's *ex post* conjecture, in its brief on appeal, that a prosecutor might entertain "a fear that some postal employees harbor an antipathy towards the U.S. Attorney's Office" because that office is charged with enforcing Postal Service work-place crimes, only serves to underscore the lacunae in the record made at voir dire.

Given the opacity of the voir dire record with respect to the postal-worker explanation, I think the proper course would be a remand to the district court to permit a determination by that court of whether the postal-worker explanation is one to which it gave any weight when it overruled the defense's objection to the striking of Ms. Lucas.

Were the district court to find that it had given weight to the postal-worker explanation, it would then be open to the government to undertake to show in what way the presence on Mr. Uwaezhoke's jury of any postal worker, or of Ms. Lucas in her postal-worker status in particular, might have been reasonably thought by the government to be detrimental to the government's chances of getting its case fairly considered. The district court would then have a record basis for deciding whether the government's concerns (1) had a sufficient grounding in reality so as to outweigh whatever the district court might find to be the probable reduction in black juror presence entailed in excluding postal workers, or (2) were so incongruous as to be properly characterized as pretextual.

If, on the other hand, the district court were to find that it had not given weight to the postal-worker explanation (thereby confirming my colleagues' reading of the trial transcript), it would then follow that Mr. Uwaezhoke's conviction should be upheld—unless the government's alternative explanation for striking Ms. Lucas ("it's a person that may be involved in a drug situation where she lives"), an explanation that the district court manifestly did give weight to, is flawed. To that question, I now turn.

## B.

This court affirms the action of the district court in upholding the government's peremptory challenge of Ms. Lucas, a black woman of modest income bringing up two small children in an apartment in Newark—a peremptory challenge defended by the government on the stated rationale that "it's a person that may be involved in a drug situation where she lives." I have difficulties with the government's stated rationale. Those difficulties stem from what appears to be the inevitable compromise of racial randomness in jury selection that flows from that rationale. In its brief in this court the government elaborates on the rationale:

> In regard to the Government's comment that Ms. Lucas "may be involved in a drug situation where she lives," Supp.App. at 54, the Government was aware that Ms. Lucas rented an apartment in Newark, New Jersey. Supp.App. at 61. It was not unreasonable for the Government to speculate that Ms. Lucas, living on a single income from her postal employment, supporting a child, in an apartment in Newark, New Jersey, may be living in a low-income area that has a drug problem.

Appellee's Brief at 16.

Elsewhere in its brief the government explains the particular significance of Ms. Lucas' residence *in Newark:*

> Contrary to Uwaezhoke's suggestion, the Government's statement that Ms. Lucas "may be involved in a drug situation where she lives," Supp.App. at 54, was not based on racist assumptions about Blacks. Although one certainly need not live or work in Newark, New Jersey to be familiar with its reputation as a national leader in the areas of drug crime and violent crime, it is noteworthy that the U.S. Attorney's Office for the District of New Jersey, where the prosecutors work every day, is located in Newark. The Government's suggestion that Ms. Lucas may live in a high crime area that experiences drug problems is certainly a reasonable inference based on: (1) Ms. Lucas' likely economic status as a single parent supporting

a child on her salary from the post office, and (2) the fact that she resides in an apartment in Newark. Supp.App. at 52, 61. Had the Government made a similar comment about a Black professional woman from the suburbs, Uwaezhoke's argument might have some merit. On the facts of this case, it has none.

*Id.* at 12 n. 3.

Routinely to exclude from jury service in drug cases tried in the Newark federal courthouse a category of potential jurors defined by residence in Newark will have a substantial skewing effect on the racial composition of the juries thus selected. As has been noted, some 600,000—or approximately one-fifth—of the residents of the seven-county catchment area feeding the Newark federal courthouse are black. But, in Newark proper, blacks constitute 58.5%—approximately 160,000—of a city population of 275,000. *U.S. Bureau of the Census, Statistical Abstract of the United States: 1992* (112th ed., 1992) p. 36.

Of course the government's rationale does not necessitate striking all 160,000 blacks residing in Newark. The government's concerns center on persons "living in a low-income area." But that qualification does not necessarily carry with it much reassurance. Indeed, it may serve only to compound the difficulty. The government has not offered a description, in dollar metes and bounds, of Newark's "low-income area"; in the absence of such a description, we may be warranted in assuming that the government, in the district court and here, has had in mind, at a minimum, those sections of Newark that are inhabited by persons living below what the Census Bureau denominates as the "poverty level." Unhappily, "poverty level" correlates closely with race. In the northeastern United States (New England, New York, New Jersey and Pennsylvania), 9.2% of whites and 28.9% of blacks are below the poverty level. *Id.* at 457, Table 720; (1990 "weighted average poverty threshold" for three-person households was $10,419, *id.* at 427).[3]

---

**3.** In making educated guesses about the racial impact of excluding "low-income" Newark resi-

dents from juries trying drug cases, one should also bear in mind that (1) 26.1% of Newark's

In sum, one cannot, on this record, say with assurance what impact the exclusion of "low-income" Newark residents from jury service in drug cases in the Newark federal courthouse would have on the racial composition of such juries. But one can with considerable confidence say that, measured against the racial distribution in the seven-county catchment area as a whole, such exclusion would, to a significant degree, disproportionately disqualify black potential jurors.[4]

The court, in applying the three-stage *Batson/Hernandez* inquiry,[5] concludes—and I agree—that the government's rationale for excluding "low-income" persons from serving as jurors in drug cases is, on its face, race-neutral. As the court puts it:

> While it is certainly conceivable, as Mr. Uwaezhoke suggests, that the prosecutor took one look at Ms. Lucas' color and thought, "Blacks who live in poor neighborhoods cannot be trusted to fairly enforce drug laws against other blacks," it is equally possible that the prosecutor concluded that any one, regardless of color, who lives in a poor neighborhood in Newark may have had personal experience in drug trafficking that would make their reaction to trial evidence unpredictable. We cannot find that discriminatory intent was inherent on the face of the government's explanation, and so we hold that the explanation is valid as a matter of law. If there was actual racial discrimination lurking behind this explanation, it can be found only as a matter of fact.

Supra, at 394.

I also agree with the court that the fact that an apparently race-neutral rationale may entail a racially disparate impact does not, as a matter of law, vitiate the facial racial neutrality of the rationale but, rather, poses a factual question to be addressed at the third stage of the *Batson* inquiry—the stage at which, having determined that the government's stated rationale is, as a verbal proposition, race-neutral, the trial court must decide whether the rationale is as a matter of fact pretextual, i.e., "whether the defendant has carried his burden of proving purposeful discrimination."[6] The opinion of the court puts the matter this way:

> If the government's explanation, generally applied, would have a disparate impact on a particular racial group, this fact should cause a trial judge to exercise special scrutiny during the third step of the *Batson* process to determine whether intentional discrimination, as a matter of fact, underlies the government's peremptory challenge. Indeed, a trial judge may be justified in concluding at that stage that discriminatory intent has played a role in the challenge when the disparate impact is great and any legitimate concern of the prosecutor slight. But the role of disparate impact in the *Batson* analysis is as circumstantial evidence of discriminatory intent at the third stage and not as a controlling legal factor at the second.

Supra, at 393.

The court is correct in saying that, when "the government's explanation, generally applied, would have a disparate impact on a particular racial group, this fact should cause a trial judge to exercise special scrutiny ... to determine whether intentional discrimination, as a matter of fact, underlies the government's peremptory challenge." And the court is equally correct in noting that the trial judge would be warranted in drawing an inference of discriminatory intent "when the disparate impact is great and any legitimate concern of the prosecutor slight." My disagreement with the court is that, having laid out the appropriate analytic scheme, it does not apply that scheme to the case at bar. A reading of the trial transcript does not suggest that the disparate impact on blacks which the Repetto explanation apparently en-

---

population is Hispanic, *U.S. Bureau of the Census, Statistical Abstract of the United States: 1992* (112th ed., 1992) 36, (2) "Hispanic persons may be of any race," *id.* at 37 n. 2, and (3) 36.4% of Hispanics in the northeastern United States are below the poverty line. *Id.* at 457, Table 720.

4. Also, of course, such exclusion would, as intended, skew the class composition of juries. But that effect does not, in terms, fall within the *Batson* interdiction.

5. *See supra* note 1.

6. *Hernandez,* —— U.S. at ——, 111 S.Ct. at 1866.

tails led the trial judge to undertake any "special scrutiny," let alone to weigh the gravity of the probable disparate impact against the substantiality of "any legitimate concern of the prosecutor." The trial judge said (1) that he was "going to accept the government's explanation;" (2) that "[o]ther reasons [additional to the Tannenbaum postal-worker explanation] were given;" (3) that "[t]he record will speak for itself;" (4) that "Juror No. 4 is black and has not been challenged;" (5) that the government's quasi-"policy" with respect to postal workers "was expanded upon by Mr. Repetto;" and (6) that the "[m]otion [was] denied." [7]

There is, of course, no reason to be surprised that the trial judge did not engage in the "special scrutiny," and attendant balancing, called for in today's opinion for the court. Prior to today, this court had not articulated a "special scrutiny" standard. And, more to the point, at voir dire, defense counsel did not undertake to buttress his objection to the government's peremptory challenge of Ms. Lucas with any information or even any argument on what the implications of the Repetto explanation would be if generally followed in the selection of juries in drug cases in the Newark federal courthouse. [8] I do not, therefore, fault the trial judge for not carry-

ing out a task whose contours had not been prescribed and the tools for which had not been supplied to him. Under these circumstances, I think the proper course is to remand this case in order to accord the trial judge the opportunity to conduct the inquiry and make the determination called for by this court's opinion.

### C.

For the reasons given, I am of the view that this case should be remanded to the district court for a reexamination of both of the explanations for striking Ms. Lucas—the postal-worker explanation and the "it's a person that may be involved in a drug situation where she lives" explanation—vouchsafed by the government at voir dire.

I would surmise that in the event of such a remand the government would elect not to pursue the proposition that postal workers as a class—a class that numbers some 730,000 nationwide, U.S. Postal Service Work Force Profile (Aug. 21, 1992)—are generically not to be trusted to try federal drug cases. That would leave the more serious question: in a city which is 58.5% black, is the exclusion from jury service in drug cases (which appear to constitute the largest category of

---

7. This court's exposition, in the closing paragraph of its opinion, of why the district court's ruling is to be affirmed, does not suggest that my colleagues in the majority read the trial transcript with significantly greater breadth than I do:

We find credible record evidence that logically supports the district court's determination that the government had no intent to discriminate against black jurors. As we have indicated, prosecutor Repetto tendered to the district court a racially neutral explanation that was plausible. Moreover, as the trial judge noted at the time, this explanation was buttressed by the fact that the government had earlier had repeated opportunity to challenge the black juror who in fact served on Mr. Uwaezhoke's jury, and declined to do so. We acknowledge that Repetto's explanation would have been more credible if the government's far less plausible alternative explanation had not been advanced. We also acknowledge that Repetto's explanation, if generally applied, would be likely to have a disparate impact on blacks in the vicinage and, accordingly, is one that should be scrutinized with care. We are unwilling to hold, however, that these facts, sin-

gly or together, required the district court to reject Repetto's explanation. The trial judge was far better situated than we to determine whether that explanation was fact or pretext. He concluded that it was fact, and we cannot fault him for doing so.

Supra, at 394–95.

8. Even in defendant's brief on appeal no attempt has been made to present data bearing on the question whether the exclusion from jury service of low-income Newark residents would be likely to skew the racial composition of the resultant juries. Similarly, defendant's brief does not address the likely impact of excluding postal workers. Presumably because defendant's brief is silent on these matters, the government's brief is likewise silent. Given this information gap, I have found it necessary, in preparing this opinion, to make substantial demands on the time of the staff of the William H. Hastie Library of the United States Court of Appeals for the Third Circuit—the staff which is so capably led by Susan B. English, Circuit Librarian; for the cheerful and resourceful assistance provided by Ms. English and her colleagues—most particularly, Karen L. Richardson, Assistant Librarian for Research—I am very grateful.

federal felony prosecutions[9]) of all persons who live in a "low-income area" compatible with *Batson?*

A very similar question recently confronted the Ninth Circuit in *United States v. Bishop,* 959 F.2d 820 (9th Cir.1992). There, in the course of selecting a jury to try a black defendant charged with drug-trafficking and assaulting a federal officer, the government exercised a peremptory challenge to strike Ms. Burr, a black eligibility worker who lived in the Compton area of south-central Los Angeles. In justifying the challenge government counsel:

> stated that he felt that an eligibility worker in Compton is likely to take the side of those who are having a tough time, aren't upper middle class, and probably believes that police in Compton in South Central L.A. pick on black people.
>
> To some extent the rules of the game down there are probably different than they are in upper middle class communities. And they probably see police activity, which is, on the whole, more intrusive than you see in communities that are not so poor and violent.

*Id.* at 822.

Defense counsel was unpersuaded: "Specifically, in view of the fact that approximately three quarters of Compton's population is black, he argued that residence in this case served as a mere surrogate for race." *Id.* The district court rejected the *Batson* claim. But the Ninth Circuit took a different view:

> ... [T]he proffered reasons (that people from Compton are likely to be hostile to the police because they have witnessed police activity and are inured to violence) are generic reasons, group-based presuppositions applicable in all criminal trials to residents of poor, predominantly black neighborhoods. They amounted to little

more than the assumption that one who lives in an area heavily populated by poor black people could not fairly try a black defendant.

*Id.* at 825. Concluding that the government's reasons were not race-neutral, the Ninth Circuit reversed.

I agree with the Ninth Circuit that the peremptory challenge at issue in *Bishop* was fraught with constitutional risk: "the invocation of residence both reflected and conveyed deeply pernicious stereotypes." *Id.* I would not, however, have followed the analytic path taken by the Ninth Circuit. In my view, the government's explanations in *Bishop,* like the explanations tendered by the government in the case at bar, were, as unadorned verbal propositions, race-neutral; the question that should have been examined there, and that, in my judgment, should, via remand, be reexamined here, with the "special scrutiny" called for in today's opinion for the court, is whether, considered in context, the tendered explanations were pretextual.

The issues posed in cases such as *Bishop* and the case at bar go to the core of *Batson* and hence are of great importance to the due administration of equal justice under law. The reason this is so was stated clearly for this court by Judge Higginbotham on March 5, 1993, the last day of his twenty-nine years of distinguished judicial service:

> ... [I]f tension exists between the "old tradition" of unconsidered preference for unfettered use of peremptory challenges and the still relatively "young tradition" of meaningful safeguards against invidious application of racial stereotypes, then the latter consideration must prevail. If the former consideration still prevailed, the "price" would be the jeopardizing of the integrity of the judicial process and the stigmatization of venirepersons of color.

9. I have not been able to locate an exact, and current, statistical breakdown of federal felony cases. But reasonable inferences can be drawn from other data: In 1989, district courts sentenced 27,377 persons to prison terms; of those persons, 13,306 had been convicted of drug and drug-related offenses. Timothy J. Flanagan and Kathleen Maguire, eds. *Sourcebook of Criminal Justice Statistics 1991,* U.S. Dept. of Justice Bureau of Justice Statistics (1992) 505 Table 5.20.

In the district courts of the Third Circuit, in the twelve-month period from October 1, 1990 to September 30, 1991, drug cases constituted 21% of the total criminal filings; for the District of New Jersey, the figure was 15%. In the twelve-month period from October 1, 1991 to September 30, 1992, the Circuit-wide figure was 23%, and the figure for the District of New Jersey was 14%. *United States Courts of the Third Circuit: 1992 Annual Report* (1993) 89.

And such a price would be "too high." [*Georgia v. McCollum,* —— U.S. ——, ——, 112 S.Ct. 2348, 2358, 120 L.Ed.2d 33 (1992) ] (citing *Edmonson v. Leesville Concrete Co., Inc.,* —— U.S. ——, ——, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660 (1991)).

*Jones v. Ryan* (3d Cir.1993) 987 F.2d 960, 968.

### SUR PETITION FOR REHEARING

June 11, 1993.

Before SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ROTH, LEWIS, Circuit Judges, and POLLAK, District Judge *.

The petition for rehearing filed by appellant in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.