

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-3-2002

# USA v. Milan

Precedential or Non-Precedential: Precedential

Docket No. 01-2603

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Milan" (2002). *2002 Decisions.* Paper 549.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/549

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed September 3, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2603

UNITED STATES OF AMERICA

v.

MILTON MILAN

        Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. Crim. No. 00-194)
District Judge: Honorable Joel A. Pisano

Argued May 20, 2002

BEFORE: BECKER, Chief Judge,
GREENBERG, Circuit Judge, and
BARZILAY, Judge, U.S. Court of International Trade*

(Filed: September 3, 2002)

        Richard Coughlin (argued)
        Julie A. McGrain
        Office of the Federal Public Defender
        800 Hudson Square
        Suite 350
        Camden, NJ 08102

         Attorneys for Appellant

_____

*Honorable Judith M. Barzilay, Judge, United States Court of
International Trade, sitting by designation.

        Robert J. Cleary
        United States Attorney
        970 Broad Street, Room 700
        Newark, N.J. 07102-2535

        Norman Gross (argued)
        Assistant United States Attorney
        George S. Leone (argued)
        Chief, Appeals Division
        Office of the United States Attorney
        Camden Federal Building and
        United States Courthouse
        401 Market Street, Fourth Floor
        Camden, NJ 08101

Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

This case comes on before this court on appeal from a final judgment of conviction and sentence entered in the district court following defendant-appellant Milton Milan's conviction by a jury on 14 counts of mail fraud, wire fraud, money laundering, and related criminal conspiracies in part for his activities undertaken while in public office. The district court sentenced Milan, the former mayor and city council president of the City of Camden, New Jersey, to 87 months imprisonment.

On appeal, Milan advances three grounds to overturn his conviction on all counts. First, he contends that under Matson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986), the district court erred in finding that the government's decision to exercise a peremptory challenge to a juror was not motivated by discriminatory intent. In the alternative, Milan maintains that the district court misapplied the legal standards the Supreme Court enunciated in Batson by improperly deferring to the prosecution's proffered legitimate justifications for using three of four of its peremptory challenges to strike African-American jurors from the panel. Lastly, Milan suggests that the district

2

court erred by using the phrase "moral certainty" in its jury charge on reasonable doubt.

Milan also challenges specific counts of his conviction. First, he argues that we should reverse his conviction on counts 3 and 9 (wire fraud and conspiracy arising out of his illegal receipt of monies and other benefits during his tenure in office) because the government premised its case largely on testimony from a cooperating witness without disclosing material impeachment evidence (tape recorded conversations) in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), which imposes a duty on the government to provide the defense with potential exculpatory or impeachment evidence. Second, Milan argues that we should reverse his conviction on counts 3, 9, 15, 16, and 17 because the government improperly vouched for the credibility of key witnesses whose testimony advanced Milan's convictions on those counts.

Finally, Milan maintains that we should vacate his sentence and remand the case for resentencing because the district court erred in applying a 3-level upward departure for Milan's acts of public corruption under U.S.S.G. S 2C1.7, Application Note 5, to the final combined offense level after grouping rather than to the offense level established for the public corruption charges only.

The panel unanimously agrees that the judgment of conviction should be affirmed on all counts and thus unanimously joins in all aspects of the opinion except for section II. E. "3-Level Upward Departure." Judge Greenberg, however, believes that the judgment should be reversed to the extent that it imposed the sentence and thus is filing a separate opinion dissenting from the affirmance of the sentence.

I. BACKGROUND

A. Milan's Crimes in his Private Capacity

The evidence at the trial demonstrated the following.1 In

_____

1. We point out that Milan does not challenge the sufficiency of the evidence to support his conviction.

October 1992, Milan formed the Atlas Contracting Company ("Atlas") with his friend, Gholam H. Darakhshan, to undertake commercial and residential construction projects in the Camden area. On August 11, 1994, Atlas obtained a contract for the construction of 13 homes at Arthur's Court in Camden. Inasmuch as the contract required Atlas to secure a performance and payment bond, it entered into a surety arrangement with Amwest Surety Insurance Company in which Amwest agreed to issue bonds for each phase of construction. Amwest, however, required Atlas to post collateral as a condition for Amwest issuing the bonds.

To satisfy this obligation to post security, Milan and Darakhshan borrowed $65,000 in cash from Jose Rivera, the owner of an automotive parts store which functioned in part as a front to launder the profits of local drug dealers. Realizing that Rivera had obtained the loan money from nefarious activities, Milan and Darakhshan concocted a scheme to utilize the narcotics-related proceeds without arousing the suspicions of the Internal Revenue Service to which, by law, domestic currency transaction reports for cash deposits of $10,000 or more must be sent. Specifically, they divided the cash into amounts of less than $10,000 which they distributed to friends and relatives who, in turn, transferred the money to Atlas in the form of bank checks or personal checks. Milan and Darakhshan also deposited some of the cash directly into an Atlas account. They then purchased a $60,900 certificate of deposit from a bank in Camden and assigned it to Amwest as collateral security. Subsequently, over the course of a few months, Milan and Darakhshan issued a series of checks in amounts of less than $10,000 made out from Atlas to themselves or to various friends and family members as ostensible "loan repayments."2 Milan and Darakhshan eventually cashed the checks and repaid Rivera the $65,000 together with $10,000 in interest.

In addition to money laundering, Milan and Darakhshan
used Atlas to perpetrate insurance fraud. In June 1994 and

---

2. Milan and Darakhshan wrote the words "loan repayments" on the
memo lines of some checks.

February 1995, Atlas entered into an agreement with AT&T
Capital Leasing Corporation for the lease of two computers,
two printers, and one copy machine. Atlas then secured
commercial property insurance from Selective Insurance
Company to protect against loss or damage to the
machines.

On December 31, 1995, Milan and Darakhshan staged a
sham burglary of the Atlas office, removing property and
breaking a window. They later filed a false stolen property
report with the Camden police and a lost property
worksheet with the insurance company. Atlas received
$4,743.50 from Selective in satisfaction of the false claim.
Milan kept one of the computers for personal use until
August 1997, when he sold it to a former student intern.

B. Milan's Crimes as a Public Official

Milan was elected a member of the Camden city council
on November 7, 1995, and was elected its president on
January 1, 1996. On May 13, 1997, Milan was elected
mayor of Camden, a position to which he was sworn in on
July 1, 1997.

In March 1996, Milan met Daniel Daidone, an associate
of Ralph Natale, a notorious organized crime boss in
Philadelphia. Natale previously had recruited Daidone and
Caesar Ortiz, a Puerto-Rican businessman and electrical
contractor, to manage and operate Trans-Aero, a
government certified minority-owned business enterprise
which was to compete for government contracts on Natale's
behalf.

Correctly anticipating that Milan would be receptive to
accepting kickbacks in exchange for helping Trans-Aero
secure business projects in Camden, Daidone delivered an
initial payment of $500 in cash to Milan, a transaction he
reported to Natale. Thereafter, Daidone, acting on Natale's
behalf, continued to deliver periodic bribes to Milan
(occasionally at his office in Camden City Hall) until Milan's
arrest in June 1998. All told, Milan received between
$30,000 and $50,000 in cash, including a $1,433 payment
toward a January 1998 Florida vacation for himself and his
then fiance. Milan, in turn, did numerous favors for Natale
and his organized crime associates, including lobbying on

their behalf to secure federally-subsidized construction

contracts in a Camden empowerment zone, attempting to contact the mayor of Cherry Hill, New Jersey, to obtain a liquor license for a restaurant owned by one of Natale's associates, and arranging a meeting between Natale's associates and government officials presiding over Camden waterfront renovation projects.[3]

In addition to cash, Milan received other improper benefits during his tenure in public office. On December 16, 1996, Milan arranged to have the title of a 1990 Chevrolet Lumina Van transferred to his fiance from Nick's Towing, an outfit which provided towing services to the City of Camden.[4] Milan also obtained approximately ten months free use of a 1996 GMC Jimmy truck leased to Dominick Monaco, the owner of Nick's Towing. On March 27, 1997, the city council of Camden awarded a contract to Nick's Towing to provide towing services for a two-year term at a contract price not to exceed $480,000. Milan did not disclose publicly his receipt of these gifts from Nick's Towing on his state-mandated financial disclosure statements.

In June 1997, the James B. Ryan Air Conditioning Company executed a three-year contract with the City of Camden for the servicing and maintenancing of air conditioning and heating systems in various city-owned buildings. In May 1998, at Milan's request, the company installed an air conditioning system at Milan's personal residence. Milan did not pay for these services and did not disclose his receipt of them on his financial disclosure statements. The services, valued at $3,346, took two men six days to complete.

In April 1998, a concrete recycling company, Delaware River Recycling, applied to the Camden County Solid Waste Advisory Council for a permit to operate a recycling facility. That same month, Milan asked Robert Casey, the owner of Delaware River Recycling, to do home improvement work at

---

3. The Cherry Hill mayor did nothing improper and did not support the application.

4. Nick's effectuated the transfer through a third party.

Milan's private residence. Casey obliged, sending a work crew to tear down a garage and remove a tree. Casey also paid $700 for the installation of new carpeting at Milan's home. Milan, who did not pay for these services, wrote a letter in his official capacity on September 3, 1998, supporting the application of Delaware River Recycling. Casey forwarded the letter to the Camden County Solid Waste Advisory Council. As in the other instances we have recounted with respect to improper benefits, Milan did not disclose his receipt of these gifts from Casey.

In July 1998, Milan received an estimate from R&G Home

Improvement for the installation of new windows at his residence. R&G, owned and operated by Ralph Cruz Sr. and Ralph Cruz Jr., provided a figure that included costs for materials and supplies but not for labor, with the anticipation that Milan in turn would take the necessary steps to expedite payments owed to R&G for work it had done for the City of Camden. Sure enough, on August 14, 1998 (five days after R&G submitted its estimate), Milan arranged a meeting among himself, Ralph Cruz Sr., Ralph Cruz Jr., and the director of the Camden Housing Services Department to discuss the unpaid bills. From September until December 1998, R&G installed approximately 25 new windows at Milan's home without charging Milan for the $1,800 in labor costs it incurred.

Milan abused his public office in other, more creative ways. In April 1997, he established with the New Jersey Election Law Enforcement Commission a Joint Candidates Committee ("JCC") to raise campaign funds for three city council candidates politically affiliated with him. Milan installed his aide, Milton Bradley, as JCC treasurer. Milan later informed Bradley that he and several of his political supporters would be taking a celebratory vacation to Puerto Rico after the May 1997 city council elections. He then directed Bradley to finance the trip with funds from the JCC. Milan and Bradley devised a scheme to disguise the disbursement as a legitimate business expense for the JCC. They asked Mark Willis, the owner of the Camden office building in which Milan's mayoral campaign headquarters was located, to draft a fake lease to demonstrate that monthly lease payments were due from Milan's campaign

even though Milan's campaign was using Willis's office space without charge.

On May 1, 1997, flights and hotel reservations for this trip were booked through a travel agency for 15 people, including Milan and his fiance. The group vacationed in Puerto Rico from May 16 to May 20, 1997, with expenses charged on the personal American Express account of a Camden attorney. Upon his return, Milan had Bradley draw a check for $7,500 on the JCC bank account payable to Willis's management company. On June 4, Willis deposited the check into his corporate bank account and, through a series of transactions with third parties, obtained $7,500 in cash proceeds from the check. On June 12, Willis gave $5,000 to Bradley and $2,500 to Milan. Bradley, in turn, gave the $5,000 to the attorney as a partial repayment for vacation expenses.

As a public official, Milan was required under New Jersey state law to complete an annual financial disclosure statement detailing his business interests and sources of income. Milan completed, signed, and mailed those forms in 1997, 1998, and 1999, but, as we have indicated, failed to mention his receipt of the benefits we have described.

C. Procedural History

On March 23, 2000, a grand jury sitting in Camden returned a 19-count indictment against Milan. A superseding indictment was returned on July 12, 2000. Counts 1 through 8 charged a scheme to defraud the public of Milan's honest services as a public official in violation of the mail and wire fraud acts, 18 U.S.C. SS 1341, 1343, 1346, and 2. Specifically, counts 1, 4, and 8 involved the mailing of Milan's financial disclosure statements, count 2 involved a phone call between Daidone and Milan (during which Milan asked Daidone to supply him with "resources"), count 3 involved a January 2, 1998 fax transmission from a travel agency concerning Milan's trip to Florida, and counts 5 and 6 involved Milan's letter to Robert Casey supporting the application of Delaware River Recycling for a recycling permit.

Count 9, involving conduct while Milan was in public office from March 1996 until June 1998, charged a

8

conspiracy to travel and use interstate facilities to solicit and accept bribes to influence a public servant in violation of 18 U.S.C. S 371. Counts 10 and 11 charged Milan with conspiracy and extortion under 18 U.S.C. S 371 and 18 U.S.C. S 1951(a), alleging that Milan threatened to remove the municipal public defender from office unless he contributed $5,000 to a political action committee aligned with Milan.

Counts 12, 13, and 14 charged Milan with using political campaign contributions to pay for the Puerto Rico vacation in violation of the mail and wire fraud acts, 18 U.S.C. SS 1341, 1343, 1346, and 2. Specifically, count 12 was predicated on a phone call from a domestic travel agency to a hotel in Puerto Rico, count 13 on a computer request for an airline ticket from an airline in Tulsa, Oklahoma, and count 14 on a mailed $7,000 check payable to a credit card company.

Counts 15, 16, and 17 charged a conspiracy to structure currency transactions in violation of 18 U.S.C.S 371, a conspiracy to commit money laundering in violation of 18 U.S.C. S 1956(h), and money laundering in violation of 18 U.S.C. S 1957(a). These charges pertained to Milan's financial transactions involving the $65,000 loan from Jose Rivera to Atlas Contracting Company. Finally, counts 18 and 19 charged mail fraud in violation of 18 U.S.C.SS 1341 and 2, predicated on Milan's use of the mail in connection with his staged burglary of Atlas to collect insurance proceeds.

Jury selection commenced on October 23, 2000. During the final selection process Milan's attorney raised an unsuccessful Batson objection to the government's use of its peremptory challenges. The evidence portion of the trial began on November 6, 2000, and was concluded on

December 21, 2000. The jury convicted Milan on all counts
except 2, 5, 6, 10, and 11.5

Following the verdict, the court at Milan's request
removed his trial attorney and appointed the Federal Public

_____

5. The jury acquitted Milan on counts 10 and 11 and was unable to
reach a verdict on counts 2, 5, and 6.

9

Defender to file post-verdict motions and represent Milan at
sentencing. In May 2001, Milan's new attorney wrote a
letter to the prosecutor requesting copies of taped
conversations (or evidence documenting their disclosure to
his prior attorney) of Natale during his incarceration from
October to December 1999. The tapes, recorded by the
Bureau of Prisons, allegedly indicated, among other things,
that Natale expected an early release as a result of his
agreement to cooperate with the government. Milan
subsequently moved for a new trial on the counts to which
Natale's testimony was directed (3 and 9) on the grounds
that the government's failure to disclose the tapes, germane
for impeachment purposes at Milan's trial, violated Brady
and the Jenks Act, 18 U.S.C. S 3500. The district court
denied the motion, concluding that the tapes were
sufficiently immaterial such that their non-disclosure did
not undermine the integrity of the verdict to warrant a new
trial.

On June 15, 2001, the district court sentenced Milan to
87 months imprisonment, in part arriving at this figure by
departing upwards 3 levels by reason of Milan's pervasive
and systematic corruption of a government function. Milan
unsuccessfully objected to the court's sequencing
methodology, arguing that the departure should have been
added only to the counts grouped as corruption-related
rather than to the combined, total offense level calculated
after grouping. If the court had accepted Milan's argument
his sentence range would have been lower. The court
entered the judgment of conviction and sentence on June
15, 2001, and Milan subsequently filed a timely appeal. We
have jurisdiction under 28 U.S.C. S 1291 and 18 U.S.C.
S 3742(a), eand the district court exercised subject matter
jurisdiction pursuant to 18 U.S.C. S 3231.

II. DISCUSSION

A. Batson Challenges

In one of his two Batson challenges, Milan argues that
the district court erred in concluding that the government's
decision to strike one of the jurors was not motivated by
discriminatory intent. We review a court's finding of fact on

10

this issue for clear error, United States v. Uwaezhoke, 995 F.2d 388, 394 (3d Cir. 1993), and thus will accept its factual determination unless it "either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." Haines v. Liggett Group, Inc., 975 F.2d 81, 92 (3d Cir. 1992) (quoting Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir. 1972)).

Owing to the high publicity surrounding the case, the district court conducted an individual voir dire, questioning the 71 prospective jurors directly and allowing the attorneys to ask follow-up questions. After dismissals for cause and hardship, the court seated 12 individuals from the final pre-qualified pool at random. At this point, both the defense and prosecution initiated their exercise of peremptory challenges. The government utilized three of its first four challenges to strike African-Americans, Ms. Hargis, Ms. Gorrell, and Mr. Robinson, and used one challenge to strike a Caucasian.6 It also exercised two peremptory challenges to strike Caucasian potential alternates.

After the fifth round of peremptories (during which the government struck Mr. Robinson), Milan raised a Batson objection at a bench conference. Under Batson  and its progeny, courts should evaluate a claim of an equal protection violation7 in jury selection using the following three-step process: (1) has the objector established a prima facie case by demonstrating a pattern of peremptory challenges of jurors of a particular race?; (2) if yes, did the party defending the challenges rebut the prima facie case by tendering a race-neutral explanation for the strikes?; (3)

_____

6. Under Fed. R. Crim. P. 24, the government has six peremptories and the defense ten. Both sides had two peremptories to challenge potential alternates.

7. In Batson, which involved a state prosecution, the Supreme Court construed the Fourteenth Amendment's Equal Protection Clause, which does not itself govern federal prosecutions. Nonetheless, the Batson analysis governs this case because the Fifth Amendment which does apply to the federal government generally requires the same equal protection analysis as in Fourteenth Amendment cases. See, e.g., United States v. Leslie, 813 F.2d 658, 659 (5th Cir. 1987) (en banc).

11

if so, has the objector carried his burden of proving purposeful discrimination, for instance by showing that the proffered explanation is pretextual. See Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1866 (1991) (citing Batson).

Nevertheless, even before the district court evaluated whether Milan had presented a prima facie case, the government, as is common in the context of a Batson objection, immediately responded by stating a race-neutral

explanation for each of its contested challenges. The government noted that Ms. Hargis had lived her adult life primarily in Essex County in northern New Jersey and had moved to southern New Jersey, where Camden is located, only three years earlier. Consequently, it stated a concern that she would not "blend" with the remaining jurors who were far more familiar with the local geography and had a higher level of interest in and familiarity with the community issues relevant to Milan's trial. The prosecutor explained that Ms. Gorrell had indicated holding religious beliefs that interfered with her ability to pass judgment on other people. Finally, the prosecution emphasized that Mr. Robinson had substantial difficulty answering a number of the questions and acknowledged being unsure of what "impartial" meant. The prosecution elaborated that it was not confident of his ability to follow the nuances and complexities of a case which included 19 counts, some involving fairly intricate financial transactions, over 70 witnesses, and hundreds of exhibits.

The court rejected Milan's Batson objections, informing the parties that it would make further rulings after the completion of jury selection. Thereafter, when revisiting the issue, the court made the following findings. First, agreeing that the government's explanations were indeed facially neutral with respect to race, the court noted that the prosecutors had made no statements during voir dire which would indicate any latent bias against African-Americans. Second, the court noted that the government had chosen not to strike three other African-Americans who were seated in the final jury. Finally, the court made a credibility determination with respect to the prosecutors, holding that their reasons were genuine and made in "good faith" rather

12

than being pretextual to camouflage a race-conscious motive percolating beneath.

Milan now focuses his argument on the finding with respect to Ms. Hargis. The court, in evaluating the government's stated motivation for striking Ms. Hargis -- her inability to "blend" with the other jurors because of her lack of familiarity with south Jersey -- to some extent agreed with the defense that the reasoning seemed somewhat attenuated considering that nothing else in her background suggested an inability to function adequately as a juror. See App. at 694. Nevertheless, the court determined that the prosecution's reason was sincere and therefore survived Batson scrutiny.

This finding was not clearly erroneous. To begin with, the facts underlying the government's concern were accurate: leading up to the trial, Ms. Hargis indeed had lived in south Jersey for a shorter period than any of the 12 initially seated jurors. Moreover, it was not patently unsound or unreasonable for the government to prefer a juror with greater community ties and regional familiarity. 8 We recognize that the prosecution did not strike two other

jurors with relatively transient ties to the south Jersey community: Ms. Bond who had resided in the area for only four years and before that had lived on the west coast and Ms. Cain who had resided in the area for only six years. Yet absent further evidence probative of prejudicial motive, this minor discrepancy,9 particularly in light of the finite

---

8. We note that neither we nor the district court must endorse or reject the logic of the government's nonracial motive so long as it is deemed genuine and credible. See Hernandez, 505 U.S. at 365, 111 S.Ct. at 1869 ("In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.").

9. The fact remains that Ms. Hargis had the briefest recent residence of the three. Our analysis might be different if the reverse were true. See, e.g., Jones v. Ryan, 987 F.2d 960, 973 (3d Cir. 1993) (rejecting the prosecutor's proffered race-neutral explanation for striking black jurors where the prosecutor did not apply the same rationale to white jurors in the identical or more extreme position). It also bears mentioning that Milan struck Ms. Bond and Ms. Cain, albeit in rounds after the government struck Ms. Hargis.

13

number of peremptories available, does not undermine the integrity of the district court's factual finding.

Nothing else in the record, including the nature of the crimes, the race of the defendant or any witnesses, and the government's strikes of Ms. Gorrell and Mr. Robinson (unassailed on appeal), suggests that the government took race into account in exercising its strikes. To the contrary, though it did not exhaust its allocated peremptories, the government did not strike three of six African-American jurors.10 In fact, the percentage of African-Americans seated on the jury appears to have exceeded the percentage of African-Americans among total venirepersons. Moreover, we find nothing suspect in the government's use of the term "blending," a word that, in some circumstances, conceivably could be a cue to the presence of a sublimated discriminatory motive.11 Ultimately, the district court found the government's explanation credible, and nothing before us suggests that we should upset that finding. In short, the district court's factual finding regarding Ms. Hargis was not clearly erroneous.

In his second Batson argument, Milan claims that the district court disregarded the correct analytical framework for judging his Batson objections by failing to scrutinize

---

10. We recognize that the fact that a prosecutor did not exhaust the government's peremptory challenges to exclude all black venirepersons does not mean that the prosecutor did not exercise any peremptory challenges in a discriminatory manner. See United States v. Clemons, 843 F.2d 741, 747 (3d Cir. 1988) ("[W]e doubt the significance of including a single black on a panel if, at the same time, the government

used most of its peremptory challenges . . . to strike blacks with backgrounds similar to the white jurors ultimately selected.").

11. We realize that a prosecutor might couch a preference for a more homogeneous jury by accentuating an innocuous characteristic (e.g., geography, age, socio-economic status, marital status) which, in the interest of so-called "jury blending," not coincidentally correlates to certain demographic realities and may serve to cleave one race from another. See, e.g., Batson, 476 U.S. at 106, 106 S.Ct. at 1728 (Marshall, J., concurring) ("A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically.").

14

appropriately the race-neutral explanations the prosecution proffered for its exercise of peremptory challenges. This argument is distinct from his factual contention with respect to the government's challenge to Ms. Hargis. Typically, we exercise plenary review of a district court's application of legal precepts. See Shade v. Great Lakes Dredge & Dock Co., 154 F.3d 143, 152 (3d Cir. 1998). The government suggests, however, that our review here is governed by the more stringent plain error standard because Milan failed to object to the district court's methodology in the district court. See Fed. R. Crim. P. 52(b) ("[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court"). Milan counters with the assertion that he did preserve the claim for appellate review by pressing his generic discrimination argument, which presumptively put the court on notice that a failure to apply the correct legal standards to the facts would be objectionable.

Nevertheless, we need not determine the standard of review definitively because even under the more expansive de novo standard Milan's claim is without merit. The record explicates that the district court properly applied the three-prong analysis that Batson and its progeny delineated. In the first instance, Milan raised an objection when three of the first four prospective jurors the government struck were African-American. Then the government, before the court determined whether the prima facie threshold had been crossed, quickly articulated race-neutral explanations for all three challenged venirepersons. The district court, as required by the strictures of Batson, contemplated the proffered explanations and the evidence before it and concluded ultimately that the defense had not carried its burden of showing purposeful discrimination on the part of the government. For example, in reviewing the challenge to Ms. Gorrell, the court, in line with Batson step three, noted that it did not find "the exercise of that challenge to have been racially motivated." App. at 693.

Perhaps the court could have articulated more clearly its basis for finding that the government's race-neutral explanations were legitimate and "expressed in good faith." See App. at 670. Notwithstanding, the court, specifically

citing to and quoting Batson as well as our related case law, United States v. Casper, 956 F.2d 416 (3d Cir. 1992),12 as the proper legal standard under which to analyze the claim, fulfilled its required constitutional task by evaluating the government's reasons against the backdrop of the record to see whether there had been purposeful discrimination. Finding no basis to cast doubt on the government's race-neutral explanations, the court overruled Milan's objection. As no special scrutiny was required,13 the district court did not commit a legal error.

B. Reasonable Doubt Instruction

Milan argues next that we should reverse his conviction on all counts because the district court diluted the constitutionally required standard of proof in its jury instruction on reasonable doubt. As Milan did not raise this objection at trial, we review this contention for plain error. See United States v. Wolfe, 245 F.3d 257, 260-61 (3d Cir. 2001).

At the outset of the trial, the court gave a brief definition of proof beyond a reasonable doubt as evidence of "such a convincing character that a reasonable person without hesitation would rely and act upon it in the most important of his or her own affairs." App. at 738. The court also explained the presumption of innocence afforded to Milan and the burden of persuasion demanded of the government, with the latter satisfied only on the basis of "evidence that is produced during the course of this trial." App. at 737.

At the close of the trial, the court instructed the jury in its final charge as follows, in relevant part:

> A reasonable doubt is a doubt which a reasonable
> person has after carefully weighing all of the evidence

---

12. See App. at 689-95.

13. Milan points to a statement in Uwaezhoke , 995 F.2d at 393, that a trial court should exercise special scrutiny in the third Batson step when the government's explanation would have a disparate impact on a particular racial group. The Uwaezhoke court, however, immediately qualified this position, explaining that the existence of a disparate impact does not alter the legal standard the trial judge should apply. See id. at 393 n.4.

> based upon reason and common sense. It is the kind
> of doubt that would make a reasonable person hesitate
> to act . . . Now, a reasonable doubt is not a possible
> doubt or a fanciful doubt. A reasonable doubt is not a
> doubt arbitrarily or capriciously asserted by a juror

because of his or her reluctance to perform a difficult task. It is not a doubt arising from the natural sympathy which one may have for another . . . it is not necessary for the government to prove the guilt of the defendant beyond all possible doubt or to a mathematical certainty. If that were the rule, few persons would ever be convicted, however guilty they might be. The reason is that in this world of ours, it is practically impossible to be absolutely and completely convinced of any disputed fact which by its nature is not susceptible to mathematical certainty. Consequently, in a criminal case, it is sufficient if the proofs show that the defendant is guilty beyond a reasonable doubt, and not beyond all possible doubt. And I will sum up the concept for you in this way. Reasonable doubt may be said to exist in any case when, after careful and impartial consideration of the evidence, the jurors do not feel convinced to a moral certainty that a defendant is guilty. If, however, after a fair, impartial and careful consideration of all the evidence you are convinced of the guilt of the defendant beyond a reasonable doubt, then it is your duty to return a verdict of guilty with respect to that charge. On the other hand, after such a fair, impartial and careful consideration of all the evidence, if you have a reasonable doubt as to the defendant's guilt, then it is your duty to find the defendant not guilty of the particular offense charged. Keep in mind that in every criminal case, and certainly in this one as well, the burden is upon the government to prove the defendant's guilt beyond a reasonable doubt. The burden of proving their guilt beyond a reasonable doubt remains with the government throughout the case, and it never shifts to the defendant. And this burden of proof beyond a reasonable doubt extends and relates to each essential element of the crimes charged.

17

App. at 3610-12 (emphasis added).

Milan posits error in the court's equating of proof beyond a reasonable doubt with "moral certainty" without defining or contextualizing the phrase. See United States v. Jacobs, 44 F.3d 1219, 1226 (3d Cir. 1995) ("moral certainty" should not be used in charge). When viewed as a whole, 14 however, the instructions did not create a reasonable likelihood that the jury would have believed that it could convict Milan based on a standard of proof lower than that required by the Due Process Clause of the Constitution. See Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243 (1994). Rather, we are satisfied that the court's comprehensive charge mitigated any taint created by its single, isolated utterance of the phrase "moral certainty," as it clearly and repeatedly admonished the jury to consider only the evidence (rather than its subjective moral sensibilities) and allocated the burden of proof squarely within the province of the prosecution (the burden of proof "remains with the

government throughout the case" and "extends and relates to each essential element of the crimes charged"). Moreover, the charge explained the meaning of reasonable doubt at great length, appropriately, and without reference to the objectionable phrase. We see no reason to doubt that the jury, guided by these comprehensive instructions, 15 applied the law correctly in its deliberation.

Milan correctly notes that we expressly have discouraged use of "moral certainty" language in a reasonable doubt instruction. See Jacobs, 44 F.3d at 1226. However, the mere presence of the phrase in a jury charge does not

_____

14. See United States v. Thayer, 201 F.3d 214, 221 (3d Cir. 1999) (in evaluating a challenge to jury instructions, "we consider the totality of the instructions and not a particular sentence or paragraph in isolation") (quoting United States v. Coyle, 63 F.3d 1239, 1245 (3d Cir. 1995)).

15. We presume that the jury followed the district court's instructions. See Francis v. Franklin, 471 U.S. 307, 324 n.9, 105 S.Ct. 1965, 1976 n.9 (1985) (dubbing it a "crucial assumption" underlying our trial system that jurors carefully follow instructions) (citation omitted). Moreover, the record is consistent with this presumption, considering that the jury, after eight days of deliberation, returned a mixed verdict of convictions, acquittals, and hung counts. See United States v. Gilsenan, 949 F.2d 90, 96 (3d Cir. 1991).

18

render the instructions constitutionally defective. See Victor, 511 U.S. at 16, 114 S.Ct. at 1248 (engaging in a case-specific analysis to conclude it not reasonably likely that a jury understood the words "moral certainty" as "suggesting a standard of proof lower than due process requires or as allowing conviction on factors other than the government's proof "); see also Johnson v. Alabama, 256 F.3d 1156, 1192 (11th Cir. 2001) ("use of the term 'moral certainty' in a reasonable doubt instruction is not fatal"). As we are satisfied that the district court's charge adequately ensured that the "moral certainty" terminology reasonably would not be understood to lower the government's burden, Milan fails to demonstrate plain error, i.e. an unfair prejudicial impact on the outcome of the case.16

C. Brady Claim

Milan next argues that the government's failure to reveal exculpatory evidence requires that we reverse his conviction on counts 3 and 9. Our review of the denial of a motion for new trial on the basis of a Brady argument is de novo with respect to the district court's conclusions of law and is based on the "clearly erroneous" standard with respect to its findings of fact. See United States v. Perdomo, 929 F.2d 967, 969 (3d Cir. 1991).

Counts 3 and 9 centered around Milan's receipt of cash and other benefits from Natale through Daidone from March 1996 to June 1998. Natale, who signed a

cooperating plea agreement in September 1999 with respect to two criminal informations, was a principal government witness at Milan's trial. Daidone, however, did not testify. Natale, who also was slated to testify for the government in a separate organized crime prosecution brought in the Eastern District of Pennsylvania against Joseph Merlino, was incarcerated pending Milan's trial at F.C.I. Allenwood where the Bureau of Prisons monitored and recorded a number of his phone conversations.

The defense in the Merlino case learned of the existence of the tapes and successfully moved for their preservation and disclosure. R.J. Saturno, an FBI agent who worked on

---

16. See United States v. Thayer, 201 F.3d 214, 222-23 (3d Cir. 1999).

both the Milan and Merlino cases, subsequently transported the tapes to the office of the United States Attorney in Philadelphia.

Before jury selection began in Milan's trial, an Assistant United States Attorney from the District of New Jersey learned of the tapes. Accordingly, the prosecutor contacted the United States Attorney's Office in Philadelphia regarding the tapes and transcripts but was advised that that office, on the basis of its review of them, determined that they contained only irrelevant discussions of family matters and the like. See App. at 3772.

On May 23, 2001, some four months after the completion of the Milan trial, the government provided Milan's new attorney with copies of the tapes, as well as a written summary of the conversations and transcripts of three particular conversations. Milan moved for a new trial on the basis of the tapes on June 6, 2001, but the court denied the motion during Milan's sentencing hearing.

On July 9, 2001, the district court issued a memorandum opinion explaining its denial as follows. Revising statements made during the hearing, the court concluded that the government "could have easily reviewed the tapes and had an obligation to do so" because the information contained in them was "easily accessible." App. at 4182, 4185. Nevertheless, the court ruled that Milan's defense was not prejudiced by his trial attorney's inability to use the tapes in cross-examining Natale. We agree.

Under Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 766 (1972), the government must disclose materials that go to the question of guilt or innocence as well as materials that might affect the jury's judgment of the credibility of a crucial prosecution witness. See also United States v. Bagley, 473 U.S. 667, 676-77, 105 S.Ct. 3375, 3380-81 (1985). However, to warrant a reversal, the withheld evidence must be material, that is, of sufficient significance that its suppression deprived the defendant of

a fair trial. See United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399 (1976); see also Pennsylvania v. Ritchie, 480 U.S. 39, 57, 107 S.Ct. 989, 1001 (1987) (evidence is material only if there is a "reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been different") (citations omitted).

Portions of the tapes reveal that Natale expected an early release from prison as a result of his cooperation with the government. For example, in one conversation with Daniel D'Ambrosia, a former crime associate, Natale surmises a likely release in approximately one to two years. See App. at 3840. In another conversation, Natale informs one of his daughters that he expects to be home "not too far in the future." App. at 4067. In addition, the tapes demonstrate that Natale suggested that his involvement in the case might bring about a lucrative book or movie deal. See App. at 3922. Milan maintains that the tapes were relevant to impeach Natale's credibility by demonstrating his motive to falsify his connection to Milan to secure a reduced sentence or a financial windfall.

After a review of the extensive record in this case, we conclude that the government's failure to divulge the tapes did not impair the integrity of the trial as a whole or put the case in such a different light so as to undermine confidence in the verdict. At the outset, it bears mentioning that Milan overstates the potential benefit of the tapes to his defense inasmuch as they included, inter alia, Natale's inculpatory statement that he was "buying Milan," App. at 4131, and a statement by Natale that "I don't have to make a story up" because he had been "promised nothing" from the government. App. at 4074-75. Furthermore, to the extent that they demonstrate that Natale once anticipated government leniency in exchange for his cooperation, the tapes are undercut by Natale's subsequent recognition at his plea colloquy, some five months after the last tape was recorded, that the district court had discretion to reject any government U.S.S.G. S 5K1.1 motion for a reduced sentence or grant the motion and nevertheless limit any reduction. See id. at 775-76. Likewise, as the district court correctly noted, the suggestion that Natale had a financial incentive to lie and capitalize on his crimes is far-fetched considering that there was no credible evidence of a potential book or movie deal. In fact, Natale testified during the Merlino case that he had inflated his prospects when speaking to his wife and daughter in order to assuage their concerns over

mounting financial woes. See Appellee's Supp. App. at 797-99. Furthermore, there was an obvious non-financial reason why Natale would tell his wife and daughter that he expected to be home soon: to comfort them in a time when they missed his presence in their lives.

Most importantly, the additional evidence would have been merely cumulative. See Hollman v. Wilson , 158 F.3d 177, 182 (3d Cir. 1998); United States v. Hill , 976 F.2d 132, 136 (3d Cir. 1992). The government disclosed to Milan a wealth of impeachment materials concerning Natale, including his entire criminal history, transcripts of his testimony before a United States Senate Subcommittee investigating organized crime, a civil RICO complaint, scores of FBI 302s, hundreds of intercepted recorded conversations between Natale and other crime associates, wiretap affidavits, his cooperation agreement, the two informations to which he had pleaded guilty, the transcript of his guilty plea hearing, and an audiotape of a parole hearing. Amply equipped with materials evincing that Natale cooperated with the government in return for the possibility of a reduced sentence, Milan's trial attorney exploited this fact on cross-examination:

> Attorney: Now, getting back to the plea agreement. Your understanding is as a result of your cooperation, the government is prepared to file what is known as a substantial assistance motion, known as a 5K1.1, correct?
>
> Natale: Correct.
>
> Attorney: And that particular motion would allow you to escape the mandatory life [sentence] that you're looking at, correct?
>
> Natale: True.

App. at 1512. In addition, the district court specifically instructed the jury that in evaluating the credibility of witnesses it could consider any plea arrangements in which the government agreed to urge leniency at sentencing in exchange for witness cooperation during investigation and trial. See id. at 3607.

22

In that sense, this case is distinguishable from those relied upon by Milan where the withheld evidence was material because it deprived the defense of any reasonable opportunity to pursue a particular avenue of impeachment. See, e.g., Crivens v. Roth, 172 F.3d 991, 999 (7th Cir. 1999) (new trial warranted where the state failed to turn over the criminal history records of its witness for impeachment purposes); United States v. Service Deli Inc. , 151 F.3d 938, 942-44 (9th Cir. 1998) (new trial required because failure to disclose information regarding the central government witness, which included statements attributing inconsistent testimony to "a stroke which affected his memory," completely foreclosed certain impeachment strategies).

Moreover, even without access to the largely redundant tapes, Milan's attorney pursued a number of other means

of attacking Natale's credibility, including highlighting a prior criminal record that included complicity in more than a dozen murders. Milan's attorney also inquired into Natale's relationship with a previous Camden city council president, with whom Natale had met face-to-face on numerous occasions to bribe. This line of questioning cast doubt on Natale's claim that he had to pay Milan off using Daidone as a middle man in order to avoid public attention.

In short, Milan's attorney was not precluded from pursuing any theory of impeachment with respect to Natale. See United States v. Johnson, 199 F.3d 123, 128 (3d Cir. 1999) (rejecting Brady challenge where the defense otherwise was allowed to cross-examine prosecution witnesses on "many areas affecting credibility"). As there was considerable other evidentiary support to sustain the conviction on counts 3 and 9,[17] Milan is not entitled to

---

17. To reiterate, count 3, a wire fraud charge, alleged that Milan carried out a scheme to defraud the public of his honest services by accepting a paid golf vacation to Palm Beach, Florida. The government bolstered Natale's testimony with travel agency business records showing that Daidone paid for the trip in cash, testimony from investigators who witnessed Milan and Daidone board the plane to Florida, testimony from a hotel employee confirming their arrival, and other evidence to demonstrate that Daidone was doing and seeking business with the City of Camden. Count 9 charged a conspiracy to accept illegal payments

23

relief. See, e.g., United States v. Price, 13 F.3d 711, 722 (3d Cir. 1994).[18]

D. Improper Vouching

Milan challenges his conviction on counts 3, 9, 15, 16, and 17 on the ground that the government vouched for the integrity and strength of its case on these counts. [19] Specifically, Milan complains that there was improper vouching when the prosecutor introduced testimony about the district court's role in approving wiretaps, elicited testimony about the truthfulness of cooperating witnesses, and introduced testimony concerning the prosecution of government witnesses Jose Rivera and Saul Febo before they decided to cooperate. Because, as he acknowledges, Milan raised no objection at trial to the alleged vouching, we review the contention only for plain error. See United States v. Saada, 212 F.3d 210, 224 (3d Cir. 2000).

Vouching constitutes an "assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury." United States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998). Vouching runs the danger of influencing the jury to disregard its fact-finding mandate in favor of privileging and perhaps deferring to the view of the evidence as endorsed by a sovereign representative. See

from Natale in violation of the Travel Act. To demonstrate that Daidone functioned as an intermediary between Natale and Milan, the government introduced a tape recording of a March 1996 conversation between Daidone and Natale discussing Daidone's first meeting with Milan, as well as testimony from government agents who witnessed Daidone exiting Natale's apartment to meet with Milan, parked nearby. There was also testimony from the owner of an Italian restaurant to the effect that Natale paid him approximately $1,000 to cover the cost of a dinner at the restaurant the previous evening celebrating Milan's election as mayor.

18. We do not reach the issue of whether the prosecution had actual or constructive knowledge of the tapes and transcripts as their suppression did not materially impair the fairness of the trial.

19. These counts involved testimony of witnesses on whose behalf the government allegedly vouched.

United States v. Young, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 1048 (1985) (vouching for witnesses or expressing personal opinions concerning guilt of the accused carries "the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence"). Vouching also runs the risk of engendering a jury belief in the existence of outside information tending to support the position of the government. See United States v. Toner, 173 F.2d 140, 142 (3d Cir. 1949) (acknowledging a defendant's "right to have his guilt or innocence determined by the evidence presented against him").

For example, in United States v. Dispoz-O-Plastics, Inc., 172 F.3d 275, 284 (3d Cir. 1999), we found a prosecutor's remark about a policy of the Department of Justice not to give "two-for-one deals" improper because it was meant to convince the jury that the prosecutor somehow knew that the witnesses were telling the truth, i.e., that the department would not give a deal in return for the two guilty pleas unless it was convinced that there were two separate offenses. See also United States v. DiLoreto, 888 F.2d 996, 998 (3d Cir. 1989) (reversing convictions where the prosecutor attempted to bolster the credibility of its cooperating witnesses by stating during closing rebuttal: "We don't take liars. We don't put liars on the stand. We don't do that").[20]

While Milan attacks specific and isolated strategic choices the prosecution pursued at trial, he fails to demonstrate that a representative of the government gave inappropriate personal assurances concerning the reliability of a witness based on facts not before the jury. For instance, Milan suggests that the prosecutor's pursuit of testimony concerning judicial approval for wiretaps [21]

_____

20. United States v. Zehrbach, 47 F.3d 1252, 1267 (3d Cir. 1995) (en

banc), overruled DiLoreto because DiLoreto applied a per se rule in its analysis. However, Zehrbach did not overrule the result reached in DiLoreto. See id. at 1255 n.1.

21. The government asked Agent Saturno whether"the wiretaps on Natale's residential telephone [were] authorized by a District Court Judge right here in Camden," to which he replied, "yes." App. at 1163. While we

created the "appearance that the very court where the trial was heard had participated in and approved the government investigation." Br. at 90. But this evidence, though of tangential relevance considering that Milan's attorney never sought to challenge the government's use of wiretap techniques, was nevertheless admissible 22 and, more significantly, did not involve superfluous, personal opinions of the prosecutor vouching for a witness. See Saada, 212 F.3d at 225 (two criteria required to find vouching are: (1) the prosecutor must assure the jury that the testimony of a government witness is credible, and (2) this assurance must be based on either the prosecutor's personal knowledge or other information not contained in the record).

Likewise, with respect to the cooperating witnesses Natale, Rivera, and Febo, the prosecutor inquired into their previous convictions and their cooperation agreements, specifically those aspects requiring truthfulness in exchange for a leniency recommendation, but never made any statement that invited a plausible jury inference of extra-record proof of reliability in the government's exclusive possession. See United States v. Ramos , 27 F.3d 65, 67 n.4 (3d Cir. 1994) (no improper vouching where government merely made reference to the "truthfulness provision" of a plea agreement). As Milan fails to show that the prosecutors referred to facts not adduced at trial or offered personal opinions to bolster the integrity and believability of their witnesses, he does not carry his burden of showing prejudice. See United States v. Turcks, 41 F.3d 893, 897 (3d Cir. 1994) (an error is "plain" if it "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings") (citations omitted).

_____

see no basis to find that there was vouching by reason of this question, particularly in the absence of an objection at trial, we must say that we can see no legitimate reason for the reference to"right here in Camden." We also point out that if the prosecution stated to the jury that the judge thought that the defendant was guilty the comment might be so prejudicial as to require a new trial.

22. The defense opened the door by intimating during opening statements that the government was willing to engage in improprieties -- had made "a pact with devils," App. at 823, in order to convict Milan.

E. 3-Level Upward Departure

Lastly, Milan contends that the district court erred when it applied a 3-level upward departure to his combined offense level rather than to the public corruption counts only, which had the effect of increasing his sentence by 16 months.[23] On this point, a majority of the panel affirms the district court; however, Judge Greenberg, the author of the rest of this opinion, would reverse. The following portion of this opinion, therefore, represents the views of Chief Judge Becker as joined in by Judge Barzilay, with Judge Greenberg offering the reasons for his disagreement in a separate dissenting opinion, infra.

At sentencing, the court adopted, without objection, the grouping calculations of the Presentence Investigation Report (PSR) which, applying the methodology set forth in U.S.S.G. S 3D1.2,[24] trisected Milan's convictions into distinct groups according to the nature of the offenses: Group One, involving Milan's unlawful financial transactions concerning the loan from Rivera (counts 15, 16, and 17); Group Two, involving Milan's crimes as a public official (counts 1, 3, 4, 7, 8, 9, 12, 13, and 14); and Group Three, involving the staged burglary of Atlas Contracting Company and subsequent insurance fraud (counts 18 and 19).

The government moved for an upward departure on the grounds that Milan was involved in systematic or pervasive corruption of a public office which caused a loss of

_____

23. Our review of the district court's construction of the Sentencing Guidelines is plenary. See United States v. Swan , 275 F.3d 272, 275 (3d Cir. 2002).

24. Section 3D1.1(a) of the guidelines establishes a three-step procedure for determining the proper offense level in a case that involves multiple counts of conviction. First, counts that are "closely related" must be grouped in accordance with the provisions of section 3D1.2. Each group then is assigned an offense level based on the count with the highest offense level within that group. See U.S.S.G. S 3D1.3. Finally, if there is more than one group, section 3D1.4 provides that the combined offense level is derived by determining "units" for each group and adding offense level increases for each group to the offense level for the group with the highest specified offense level.

confidence in government. Specifically, U.S.S.G.S 2C1.7, the guideline used to calculate the adjusted offense level for the Group Two crimes, which is entitled "Fraud Involving Deprivation of the Intangible Right to the Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions," contains within its commentary Application Note 5, which states:

> Where the court finds that the defendant's conduct was part of a systematic or pervasive corruption of a

> governmental function, process, or office that may
> cause loss of public confidence in government, an
> upward departure may be warranted. See Chapter Five,
> Part K (Departures).

The court granted the government's motion, adding a 3-level upward departure to Milan's combined offense level for a total base of 27 as follows:

|  | Section 3D1.4 Units |
| --- | --- |
| Adjusted Offense Level for Group One: | 23 |
| Adjusted Offense Level for Group Two: | 18 |
| Adjusted Offense Level for Group Three: | 11 |
| Total Units | 1-1/2 |
| Greater Adjusted Offense Level | 23 |
| Increase in Offense Level | 1 |
| Section 2C1.7 Departure Increase | 3 |
| Total Offense Level | 27 |

See PSR at 21-27. With criminal history category I, the sentencing range was 70 to 87 months, and the court imposed the maximum term available within the range.

Milan maintains that the district court should have applied the departure only to the Group Two adjusted offense level, the group encompassing Milan's acts of public corruption to which the departure was applicable, before applying the multiple-grouping adjustments found in U.S.S.G. S 3D1.4. Applying the 3-level public corruption departure only to calculate the adjusted offense level of the public corruption charges would have yielded the following results:

28

|  | Section 3D1.4 Units |
| --- | --- |
| Adjusted Offense Level for Group One: | 23 |
| Adjusted Offense Level for Group Two (with three-level section 2C1.7 departure applied): | 21 |
| Adjusted Offense Level for Group Three: | 11 |
| Total Units | 2 |
| Greater Adjusted Offense Level | 23 |
| Increase in Offense Level | 2 |
| Total Offense Level | 25 |

With a criminal history category I, the sentencing range under Milan's proposed methodology would have been 57 to 71 months.

Under U.S.S.G. S 1B1.1 the steps for calculating a sentence are as follows: (a) determine the applicable guideline section for each offense from Chapter Two; (b) determine the base offense level and apply any appropriate "specific offense characteristics, cross references, and

special instructions" contained in the particular guideline in Chapter Two; (c) apply the adjustments as appropriate related to victim, role, and obstruction of justice from Parts A, B, and C of Chapter Three; (d) repeat steps (a) through (c) for each count and adjust the offense level accordingly if there are multiple counts of conviction; (e) apply the adjustment as appropriate for the defendant's acceptance of responsibility from Part E of Chapter Three; (f) determine the defendant's criminal history category as specified in Part A of Chapter Four; (g) determine the guideline range in Part A of Chapter Five that corresponds to the offense level and criminal history category previously determined; (h) determine from Parts B through G of Chapter Five the sentencing requirements and options related to probation, imprisonment, supervision conditions, fines, and restitution; and, (i) "[r]efer to Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and to any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence." U.S.S.G. S 1B1.1(a)-(i). We have held that these steps are to be applied sequentially by the sentencing

29

court. See United States v. Johnson, 155 F.3d 682, 684 (3d Cir. 1998) ("The court reads these instructions as providing a sequence of steps for the court to follow in the order in which they appear."); United States v. McDowell, 888 F.2d 285, 293 (3d Cir. 1989) (construing S1B1.1 as reflecting "[t]he intent of the Sentencing Commission . . . that the Guidelines be applied like a formula; a court . . . should go down each guideline in order, making the necessary calculations"). As we will explain infra, we think that structure applicable here.

Milan contends that the district court erred in applying the S 2C1.7 Application Note 5 upward departure at step (i) (after the step (d) grouping) rather than at step (b) (before grouping). Milan asserts that Note 5 is a departure specific to S 2C1.7 and not the type of more general,"unguided" Chapter 5 departure to which step (i) refers. This conclusion is supported, according to Milan, by the language of Note 5, which is narrowly written and directed toward the offense level determination for a S 2C1.7 offense. For the same reason, Milan submits that applying the Note 5 departure to the adjusted base offense level before grouping is more consistent with the "punishment fits the crime" logic of the Guidelines in that the upward departure for governmental corruption ought to be specifically tied to that portion of his sentence that relates to his crimes as a public official.

The government counters by arguing that Milan's proposed methodology is inconsistent with the Guidelines' text. Specifically, the government contends that the Note 5 departure is neither a "specific offense characteristic," a "cross reference," nor a "special instruction," and therefore does not fall within the ambit of S 1B1.1 step (b). Rather, the government contends, Note 5 is simply a reference to

the type of Chapter 5 departure that the sentencing court may properly consider at step (i), only after the multiple-groups adjustments have been performed. Furthermore, the government argues that the district court's methodology is more consistent with general Guidelines principles in that it allows the judge to assess the factors listed in Note 5 only after the judge has considered all of the information relevant to determining whether a departure is appropriate,

such as the defendant's criminal history and whether the defendant has accepted responsibility for his acts.

We hold that the government's position is correct, and that the district court did not err in applying Note 5 to Milan's sentence after grouping. We reach this conclusion primarily because we find the text of the Sentencing Guidelines clear on this point. In particular, we think it plain that the departure warranted by Application Note 5 does not amount to a "specific offense characteristic," "cross reference," or "special instruction," the only three types of sentencing adjustments to which step (b) explicitly refers.

Milan has conceded that Note 5 is not a "specific offense characteristic," see Milan's Reply Br. at 18, and he has not raised any argument that Note 5 is a "cross reference," nor could he reasonably do so in light of the fact thatS 2C1.7 does not include Note 5 within its four provisions-- U.S.S.G. S 2C1.7(c)(1)-(4) -- expressly designated as "cross references," see United States v. Gay, 240 F.3d 1222, 1232 (10th Cir. 2001) (concluding that the Guidelines' career offender provision, U.S.S.G. S 4B1.1, is not a"cross reference" in part because it is not labeled as such), nor does Note 5 instruct the sentencing court to apply any other guideline, which is a requirement under the Guidelines' definition of a "cross reference." See U.S.S.G. S 1B1.5 (defining a "cross reference" as"an instruction to apply another offense guideline").

We also think it clear that Note 5 does not qualify, as Milan argues, as a "special instruction," a phrase which is used as a term of art in the Guidelines. The Guidelines take care to label "special instructions" expressly as such in many subsections of Chapter Two. See, e.g., U.S.S.G. SS 2A3.1(d), 2B1.1(d), 2B4.1(c). Note 5, however, is not expressly labeled a "special instruction." We apply the rules of statutory construction when interpreting the Guidelines, see United States v. Robinson, 94 F.3d 1325, 1328 (9th Cir. 1996), and under the well-established canon of statutory construction of expressio unius est exclusio alterius, the Guidelines' failure to expressly designate Note 5 as a "special instruction" when this label is conspicuously affixed to many other provisions within the same chapter is

a clear sign that the authors of the Guidelines did not intend for Note 5 to operate as a "special instruction." Indeed, all of the provisions prominently labeled as"special instructions" appear within the text of each Guideline, unlike Note 5, which appears within the commentary to S 2C1.7. Even if Milan is correct that it is more "intuitive" to apply the Note 5 departure, which is for systematic or pervasive governmental corruption causing loss of public confidence in government, only to Milan's offenses that relate to his crimes as a public official, where the text of the Guidelines appears clear, as it does here, whatever "intuition" we may have must yield to the language of the Guidelines.

Milan argues that even if Note 5 is not expressly designated as a "special instruction," it is the functional equivalent thereof, and therefore ought to be treated as such for the purposes of step (b) of S 1B1.1. We disagree. As mentioned above, the text of S 1B1.1(b) refers only to "specific offense characteristics, cross references, and special instructions," and does not include any sort of "catch-all" provision for subsections or commentary that, while different in form, are similar in function to these three very specifically defined Guideline terms. In contrast, subsection (i) of S 1B1.1, which is the step at which the district court applied Note 5, does contain a "catch-all" provision that refers to "any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence." Moreover, Milan's contention that Note 5 is the functional equivalent of a "special instruction" is simply a restatement of his claim that Note 5 ought to be applied at step (b) rather than at step (i); in other words, Note 5 is only a functional equivalent of a "special instruction" if Milan is correct that Note 5 should be applied before the grouping adjustment. For the reasons stated above, we reject this assertion on the basis of the Guidelines' clear text.25

---

25. As support for his position, Milan cites to United States v. Nguyen, 255 F.3d 1335 (11th Cir. 2001), in which the United States Court of Appeals for the Eleventh Circuit was called upon to determine when the sentencing court ought to have applied Application Note 1 of the

32

Moreover, applying the Note 5 departure after grouping is logical. Sentencing within the range prescribed by the

---

commentary to U.S.S.G. S 2A1.1, which provides that a departure may be warranted in a murder conviction where the defendant did not intentionally or knowingly cause death (such as in the case of so-called "felony-murder"): during step (b) of the S 1B1.1 sequence, or after the determination of the combined offense level, at step (i). Interestingly, because the departure at issue in Nguyen was a downward rather than an upward departure, the roles of the parties in Nguyen were reversed: the government argued for applying the departure only to the particular offense, and the defendant argued for applying the departure to the

combined offense level. The Eleventh Circuit agreed with the government and concluded that it was proper for the sentencing court to apply the departure only to the murder offense at step (b) before determining the combined offense level.

Nguyen does not dissuade us from concluding that Milan's argument is incorrect. As the dissent points out, the court in Nguyen "implicitly" concluded that the S 2A1.1 Note 1 departure is comparable to "specific offense characteristics, cross references, and special instructions" for purposes of S 1B1.1(b). Dis. Op. at 45. The reasoning of the Nguyen court, however, was only implicit and never explicit, as the court made no effort to reconcile its conclusion with the plain language of step (b). Indeed, the Nguyen court addressed this issue in only one paragraph, see 255 F.3d at 1344-45, and offered only the summary conclusion that the sentencing court "did not err in first departing downward from the base offense level for murder and then applying the grouping rules . . . ." Id. at 1345. Furthermore, Nguyen is arguably distinguishable because it addressed an application note from an entirely different guideline section than that presented here. Although the application note considered in Nguyen, S 2A1.1 Application Note 1, is similar to the application note at issue here in that it is not expressly labeled as a "special instruction," it is different in that it makes no explicit citation to "Chapter Five, Section K (Departures)," as does S 2C1.7 Application Note 5. It may well be, therefore, that a better argument can be made that S 2A1.1 Application Note 1 is a functional equivalent of a "special instruction" than can be put forth on behalf of S 2C1.7 Application Note 5.

Nguyen illustrates how our holding today may not always be to the government's advantage. Rather, as counsel for the government conceded at oral argument, in cases in which it is a downward departure rather than an upward departure that is at issue, it would be to the government's advantage to have the departure deducted from the sentence before grouping rather than afterwards. See Trans. of Oral

33

Guidelines is supposed to be the norm, and departures the exception, see U.S.S.G., Chapter One, Part A, Intro. Comment 4(b) (departures permitted only when the sentencing court finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described" (quoting 18 U.S.C.S 3553(b)). Therefore it is sensible to first calculate the correct Guidelines sentencing range before the court determines whether a sentence within that range provides an appropriate punishment for the defendant or whether a departure is necessary. In this sense, Note 5 simply serves to "flag" for the sentencing judge an aggravating circumstance likely to occur in a S 2C1.7 offense for later consideration at the more discretionary departure stage.26

_____

Argument at 44-45 ("This isn't always going to hurt the defendant, it may be that if you get in a situation where there's going to be a downward departure, the defendant is better off having the departure applied after the grouping . . . . [S]o, this isn't a procedure that always helps the government . . . ."). The United States Attorney's Office for the

District of New Jersey, therefore, has apparently made the tactical decision that it would prefer that these departures be applied after grouping, a decision which appears to be in conflict with the strategy of its sister office, the United States Attorney's Office for the Northern District of Georgia, in Nguyen.

26. The dissent observes that the Note 5 departure for systematic or pervasive corruption of government that may cause loss of public confidence in government is distinct from the S 5K2.7 departure for "disruption of governmental function." See Dis. Op. at 43 n.7. We agree. However, we fail to see how this distinction sheds any light on the question of when in the U.S.S.G. S 1B1.1 sequence to apply the Note 5 departure. The dissent's reasoning seems to be that since we know that S 5K2.7 is a departure to be applied at step (i), the fact that Note 5 is different from S 5K2.7 in terms of the conduct to which it applies indicates that Note 5 does not apply at step (i). In our opinion, however, the dissent has taken one distinction between the two provisions -- the types of conduct to which they apply -- and erroneously inferred from this distinction another, unrelated distinction-- the point at which to apply each departure. We see no justification for this inference; the mere fact that Note 5 and S 5K2.7 apply to different types of conduct does not indicate to us that they should also apply at different stages of the S 1B1.1 sequence.

34

Then, when the sentencing court considers Note 5 at step (i), it may determine the propriety of a departure in light of full information regarding other factors relevant to the defendant's sentence, such as the defendant's background, conduct, and character. See U.S.S.G. S 1B1.1(c)-(h).27 In contrast, under Milan's scenario, the sentencing court would be forced to make a departure decision before it had made any of these findings, which would have the effect of placing, as the government colorfully observes,"the departure cart before the Guidelines Range horse."

The dissent believes that even if we are correct that a Note 5 departure must be applied only during step (i), "it does not follow logically that the court may apply the departure only to the final offense level." Dis. Op. at 41. Rather, the dissent submits, because step (i) directs a sentencing court only to "refer to," rather than "apply" the Chapter Five departures, the sentencing court is free to " 'refer' to a provision of the guidelines at step (i) but nevertheless then 'apply' the departure at an earlier step of its calculations." Id. We find the dissent's reading of a supposed distinction between "refer" and "apply" to be inconsistent with our case law interpreting S 1B1.1 as imposing a sequential order for the application of steps (a) through (i). See United States v. Johnson, 155 F.3d 682, 684 (3d Cir. 1998) ("The court reads these instructions as providing a sequence of steps for the court to follow in the

27. The language of U.S.S.G. S 5K2.0, entitled "Grounds for Departure (Policy Statement)," seems to contemplate a phenomenon akin to what has presented itself here. It notes:

> [A] factor may be listed as a specific offense characteristic under one
> guideline but not under all guidelines. Simply because it was not
> listed does not mean that there may not be circumstances when
> that factor would be relevant to sentencing. For example, the use of
> a weapon has been listed as a specific offense characteristic under
> many guidelines, but not under other guidelines. Therefore, if a
> weapon is a relevant factor to sentencing under one of these other
> guidelines, the court may depart for this reason.

(Emphasis added.) This excerpt only confirms our conclusion that when
a factor resembles a "special instruction," but is not specifically labeled
as such, the Guidelines intend for it to be considered by the sentencing
court at the departure stage, which is step (i) of the S 1B1.1 sequence.

order in which they appear.") (second emphasis added);
United States v. McDowell, 888 F.2d 285, 293 (3d Cir. 1989)
(construing S1B1.1 as reflecting "[t]he intent of the
Sentencing Commission . . . that the Guidelines be applied
like a formula; a court should go down each guideline in
order, making the necessary calculations") (emphasis
added). Under the dissent's proposed reading, step (i)
departures could be applied retroactively at step (b),
thereby creating an end-around to our requirement that the
steps of S 1B1.1 be applied in strict sequential order. While
we recognize that, as the dissent correctly observes, neither
Johnson nor McDowell considered whether all of the steps
of S 1B1.1 ought to be applied in sequential order, we see
no logical reason why the rule endorsed in each decision
should not extent to subsection (i).

Moreover, we think that the dissent is incorrect in its
view as to why the authors of the Guidelines use the term
"refer to," rather than "apply," in step (i). The departures
referenced in step (i) are discretionary in nature. See United
States v. Kikumura, 918 F.2d 1084, 1110 (3d Cir. 1990)
(noting that district courts have a "substantial amount of
discretion" in deciding whether to depart). It is for this
reason (and, as far as we can discern, this reason alone)
that the Guidelines instruct the district court merely to
"refer to" the departure provisions. "Refer" is defined by
Webster's as "to direct attention," Webster's Third New Int'l
Dict. 1907 (Phillip B. Gove ed., 1966), and this is precisely
what step (i) intends to do -- direct the attention of the
sentencing judge to the appropriate factors to be considered
in deciding whether to depart. "Refer to," therefore, is a
more appropriate term for the inherently discretionary
exercise of departing than "apply," which is defined by
Webster's as "to put into effect," id. at 105, and connotes a
rote, mechanical, non-discretionary execution of duties. We
believe that it is for this reason, and not for the reasons
offered by the dissent, that step (i) uses "refer to" instead of
"apply."

For the foregoing reasons, we hold that the district court
was correct to apply the Note 5 departure at step (i), after

the grouping of the counts, and we will therefore affirm the sentence.28

        III. CONCLUSION

        In accordance with our reasoning set forth above, we will affirm the judgment of conviction and sentence entered June 15, 2001.

_____

28. Finally, we note that, as our dissenting colleague Judge Greenberg pointed out during a colloquy with government counsel at oral argument, had the sentencing court applied the Note 5 departure at step (b) rather than step (i), the court still could have arrived at the same final sentence had it been willing to depart seven, rather than three, levels for Milan's pervasive or systematic corruption. The following represents the hypothetical calculation:

        Section 3D1.4 Units

        Adjusted Offense Level for Group One:                23
        Adjusted Offense Level for Group Two
        (with seven-level section 2C1.7 departure applied):  25
        Adjusted Offense Level for Group Three:              11
        Total Units                                          27
        Greater Adjusted Offense Level                       25
        Increase in Offense Level                            2
        Total Offense Level                                  27

The practical import of our holding, therefore, may be limited in that it is possible for the sentencing court to reach the same final sentence under either Milan's or the government's proposed methodologies. However, there is, without doubt, importance in our deciding by which route it is that the district court arrives at its final sentence. As defense counsel explained at oral argument, while it would have been possible for the sentencing court to impose the same sentence under Milan's method, in doing so the court would have had to "justify" the propriety of upwardly departing seven levels rather than merely three, which may have been difficult for the sentencing court to do. See Trans. of Oral Argument at 61-62. Moreover, as we explained above, by departing at step (i) rather than at step (b), the sentencing court has the benefit of having already considered all of the other factors listed in subsections (c) through (h) that are relevant to the defendant's sentence.

                                37


GREENBERG, Circuit Judge, dissenting:

The majority rejects Milan's argument that the district court erred when it applied a 3-level upward departure to his combined offense level rather than to the public corruption counts only. I, however, dissent on this point.

As the majority indicates, at sentencing the court trisected Milan's convictions into distinct groups: Group One, involving Milan's unlawful financial transactions concerning the loan from Rivera (counts 15, 16, and 17);

Group Two, involving Milan's crimes as a public official
(counts 1, 3, 4, 7, 8, 9, 12, 13, and 14); and Group Three,
involving the staged burglary of Atlas Contracting Company
and subsequent insurance fraud (counts 18 and 19).

The government moved for an upward departure on the
grounds that Milan was involved in a systematic or
pervasive corruption of a public office which caused a loss
of confidence in government on the basis of Application
Note 5 of the commentary to U.S.S.G. S 2C1.7, 1 the
guideline used to calculate the adjusted offense level for the
Group Two crimes, which states:

> Where the court finds that the defendant's conduct was
> part of a systematic or pervasive corruption of a
> governmental function, process, or office that may
> cause a loss of public confidence in government, an
> upward departure may be warranted. See Chapter Five,
> Part K (Departures).

(emphasis in original). The court granted the motion,
adding a 3-level upward departure to Milan's combined
offense level for a total base of 27 as follows:

|  | Section 3D1.4 Units |
|---|---|
| Adjusted Offense Level for Group One: | 23 |
| Adjusted Offense Level for Group Two: | 18 |
| Adjusted Offense Level for Group Three: | 11 |
| Total Units | 1-1/2 |

---

1. Entitled "Fraud Involving Deprivation of the Intangible Right to the
Honest Services of Public Officials; Conspiracy to Defraud by Interference
with Governmental Functions."

38

| Greater Adjusted Offense Level | 23 |
|---|---|
| Increase in Offense Level | 1 |
| Section 2C1.7 Departure Increase | 3 |
| Total Offense Level | 27 |

See PSR at 21-27. The total offense level when combined
with a criminal history category I, yielded a sentencing
range of 70 to 87 months. The court then imposed an 87-
month sentence.

As the majority indicates, Milan maintains that the
district court should have applied the departure only to the
Group Two adjusted offense level, the group encompassing
Milan's acts of public corruption to which the departure
was applicable, before applying the multiple-grouping
adjustments found in U.S.S.G. S 3D1.4. Applying the 3-level
public corruption departure only to calculate the adjusted
offense level of the public corruption charges would have
yielded the following results:

|                                                  | Section 3D1.4 Units |
| ------------------------------------------------ | ------------------- |
| Adjusted Offense Level for Group One:            | 23                  |
| Adjusted Offense Level for Group Two (with three-level section 2C1.7 departure applied): | 21 |
| Adjusted Offense Level for Group Three:          | 11                  |
| Total Units                                      | 2                   |
| Greater Adjusted Offense Level                   | 23                  |
| Increase in Offense Level                        | 2                   |
| Total Offense Level                              | 25                  |

The total offense level of 25 combined with a criminal history category I would have yielded a sentencing range of 57 to 71 months.

I believe that Milan's approach is correct and thus I dissent on this point. As the majority sets forth, under U.S.S.G. S 1B1.1, the sequence for calculating a sentence is as follows: (a) determine the applicable guideline section for each offense from Chapter Two; (b) determine the base offense level and apply any appropriate "specific offense characteristics, cross references, and special instructions" contained in the particular guideline in Chapter Two; (c)

apply the adjustments as appropriate related to victim, role, and obstruction of justice from Parts A, B, and C of Chapter Three; (d) repeat steps (a) through (c) for each count and adjust the offense level accordingly if there are multiple counts of conviction; (e) apply the adjustment as appropriate for the defendant's acceptance of responsibility from Part E of Chapter Three; (f) determine the defendant's criminal history category as specified in Part A of Chapter Four; (g) determine the guideline range in Part A of Chapter Five that corresponds to the offense level and criminal history category previously determined; (h) determine from Parts B through G of Chapter Five the sentencing requirements and options related to probation, imprisonment, supervision conditions, fines, and restitution; and, (i) "[r]efer to Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and to any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence." U.S.S.G. S 1B1.1(a)-(i).

The government interprets section 1B1 as requiring a district court to apply any departures that do not qualify explicitly as "specific offense characteristics, cross references, and special instructions" (which are considered during step (b) in calculating the offense level) during the last step in the process and thus only after grouping and only to the combined, total offense level. Thus, goes the argument, inasmuch as the section 2C1.7, Application Note 5 departure for systematic or pervasive corruption is part of the "commentary in the guidelines" but not a "specific offense characteristic," "cross reference," or "special

instruction," the court may apply it only after completing the grouping calculations during step (i) listed above. The majority accepts the government's approach.

I believe, however, that the government's position is off the mark. To begin with, the text of the guidelines is more ambiguous than the government posits. Accepting arguendo the government's initial premise that a section 2C1.7, Application Note 5 departure must be applied like a Chapter 5, Part K departure only during step (i) because it does not appear under any of the section 2C1.7 headings of "specific offense characteristic," "cross reference," or

40

"special instruction,"2 it does not follow logically that the court may apply the departure only to the final offense level. U.S.S.G. S 1B1.1(i) directs a court simply to "refer"3 to the Chapter 5, Part K departures and any other policy statements or guideline commentaries before settling on a final sentence. However, the guidelines do not dictate rigidly how or at what point in the process the departure is to be applied. In marked contrast, the section 1B1.1 Application Instructions very clearly instruct a court to "[a]pply" any victim, role, and obstruction of justice adjustments during step (c) after calculating the base offense level4 and to "[a]pply" any acceptance of responsibility adjustment during step (e) after applying the grouping rules to determine the total offense level. 5 See United States v. McDowell, 888 F.2d 285, 293 (3rd Cir. 1989) ("With respect to the adjustment for acceptance of responsibility, the Guidelines specify that this adjustment should be made only after the counts are combined.") (emphasis added). Plainly the court can "refer" to a provision of the guidelines at step (i) but nevertheless then "apply" the departure at an earlier step of its calculations.6

_____

2. The government also emphasizes the fact that Application Note 5 expressly references "Chapter Five, Part K (Departures)." But, this could mean one of two things: either that an Application Note 5 departure is a type of Chapter 5, Part K departure or that it is analogous to one for purposes of the general policy considerations applicable to all departures. See United States v. Reyes, 239 F.3d 722, 746 (5th Cir. 2001); see also The Bluebook: A Uniform System of Citation (Columbia Law Review Ass'n et al. eds., 17th ed., The Harvard Law Review Ass'n 2000) at 22-23 (the signal "see" demonstrates that the cited authority "clearly supports the proposition," drawing an"inferential step between the authority cited and the proposition it supports." However, "see" does not reflect that "the proposition is . . . directly stated by the cited authority" rather than merely following from it).

3. Emphasis added.

4. U.S.S.G. S 1B1.1(c) (emphasis added).

5. U.S.S.G. S 1B1.1(e) (emphasis added).

6. To the extent that I accept for purposes of argument that a sentencing

court must consider a section 2C1.7, Application Note 5 departure during step (i), I am consistent with our precedents holding that steps (a) through (i) are applied in a strict sequential order. See, e.g., United

41

Furthermore, though it does not appear under the heading "specific offense characteristic,""cross reference," or "special instruction," a departure for systematic or pervasive corruption of a government function is identified within the public corruption guideline itself, section 2C1.7, not within Chapter 5, Part K. Listed as an "Application Note" in the commentary, it expresses the position of the Sentencing Commission that a court, in aggravating circumstances such as those present here, may consider adjusting the sanctions (i.e. increasing the offense level) specifically for corruption-related offense conduct that falls within the scope of Section 2C. That is to say, the placement of the public corruption departure within the

_____

States v. Johnson, 155 F.3d 682, 684 (3d Cir. 1998); McDowell, 888 F.2d at 292-93. Thus, the court makes the necessary calculations under each step in order (choosing the guideline, determining the base offense level, applying adjustments, etc.) until arriving at the final step, step (i). At this point, the court considers (i.e. "refer[s] to") the Specific Offender Characteristics and Departures of Chapter Five as well as any other policy statements or commentary in the guidelines before imposing sentence. Once the court makes that consultation, it literally fulfills step (i) in keeping with our sequential-order rule as well as fundamental canons of statutory interpretation. See, e.g., United States v. Wong, 3 F.3d 667, 670 (3d Cir. 1993) ("As with statutory language, the plain and unambiguous language of the Sentencing Guidelines affords the best recourse for their proper interpretation."). Under this approach, any course of action taken by the court after that consultation is not cabined by the sequential methodology of section 1B1.1. Certainly there can be no doubt that in concluding infra that a section 2C1.7, Application Note 5 departure is to be applied during step (b) as the functional equivalent of a "specific offense characteristic," "cross reference," and "special instruction," I am not in conflict with our precedents. Moreover, one plausibly can argue that our precedents do not stand for the proposition that the entirety of the Sentencing Guideline Application Instructions are to be applied in the order in which they appear. Johnson actually stated only that subsections (a)-(g) provide a rigid sequence of steps. See 155 F.3d at 683-84. Likewise, McDowell held only that an adjustment for acceptance of responsibility under step (e) must be applied after the combined offense level has been calculated in order pursuant to steps (a)-(d). See 888 F.2d at 292-93. The cases simply do not address the question of whether the serial method of applying section 1B1.1 extends to step (i).

42

Chapter 2 public corruption guideline itself rather than within the generic rubric of Chapter 5 strongly suggests that the Commission intended for the departure to be considered at the moment the court consults the section 2C1.7 guideline to calculate the offense level for pertinent

crimes.7 A contrary reading, on the other hand, confounds a uniform, systematic reading of the guidelines by virtue of a consequently scattershot application, with some portions of a given guideline applied in computing the offense level and others applied at some later stage in the process.

The point I make is consistent with the Sentencing Commission's contemplation of two distinct types of departures: those in which "the guidelines provide specific guidance for departure by analogy or by other numerical or non-numerical suggestions" and those catch-all departures that "remain unguided," resting either upon"grounds referred to in Chapter Five, Part K (Departures) or on grounds not mentioned in the guidelines." U.S.S.G., ch. 1, pt. A, 4(b). So-called "guided departures"-- where a guideline or related commentary suggests that a departure may be warranted under certain specific circumstances considered by the Sentencing Commission8  -- "are more akin to adjustments, such as those in Chapters Two and Three, which judges use to calculate the applicable Guidelines range, rather than a departure from the Guidelines range." Michael S. Gelacak et al., Departures Under the Federal Sentencing Guidelines: An Empirical and Jurisprudential Analysis, 81 Minn. L. Rev. 299, 315 (1996);

---

7. In fact, Chapter 5 already provides for an analogous departure in circumstances where a "defendant's conduct results in a significant disruption of a governmental function." U.S.S.G.S 5K2.7. At first glance, the sweeping language of section 5K2.7 would seem to encompass the departure formulated in Application Note 5 of section 2C1.7. Yet, as even the government conceded at oral argument and as the majority acknowledges, the two departures are indeed distinct, a circumstance which I find indicative of the drafters' understanding that the more particularized section 2C1.7, Application Note 5 departure is to be applied only in the context of the precise guideline in which the Sentencing Commission deliberately situated it.

8. See, e.g., U.S.S.G. S 2B1.1, Application Note 15; U.S.S.G. S 2D1.1, Application Note 14; U.S.S.G. S 2G1.2, Application Note 12.

see also Bruce M. Selya & Matthew R. Kipp, An Examination of Emerging Departure Jurisprudence Under the Federal Sentencing Guidelines, 67 Notre Dame L. Rev. 1, 11 (1991) (A "guided" departure involves "instances in which a guideline or related commentary suggests that under particular circumstances a departure is warranted.").

Moreover, the application of a section 2C1.7, Application Note 5 departure after completion of the grouping analysis lends itself to untenable outcomes. In this case, for instance, it resulted in the district court's enhancing Milan's punishment for crimes temporally and substantively unrelated to his abuse of public office. It created a sentencing anomaly whereby, simply by opting to try distinct charges together,9 the government was able to bootstrap a 3-level public corruption departure to the

unconnected money laundering charge which drove the guideline range (an adjusted offense level of 23 as opposed to 18 for the corruption counts). Put differently, the court in essence enhanced the money laundering convictions (Group One), whose guideline range was calculated separately under Chapter 2, Section S, on the basis of an offense-specific departure contained in an unrelated section of the guidelines concerning public corruption. This methodology contravened an express design of the grouping rules to "limit the significance of the formal charging decision." U.S.S.G. ch. 3, pt. D, Introductory Commentary. See also U.S.S.G. ch. 1, pt. A, 4(a) ("the Commission has written its rules for the treatment of multicount convictions with an eye toward eliminating unfair treatment that might flow from count manipulation"); U.S.S.G. ch. 1, pt. A, 3 (the Sentencing Guidelines promote horizontal uniformity in sentencing by requiring that similarly situated defendants are sentenced similarly).

In the closest case for comparison of which I am aware, United States v. Nguyen, 255 F.3d 1335, 1345 (11th Cir. 2001), the Court of Appeals for the Eleventh Circuit confronted a similar issue with respect to applying a downward departure under U.S.S.G. S 2A1.1, Application

---

9. Of course, the consolidated trial in itself resulted in an increased combined offense level under the grouping rules.

44

Note 1, which provides that a departure may be warranted in a murder conviction where the defendant did not intentionally or knowingly cause death. In Nguyen, one of the defendants was convicted of multiple counts in a RICO conspiracy, including felony murder. At sentencing the district court calculated the offense level under section 2A1.1, departed downward 6 levels pursuant to Application Note 1, and then applied the grouping rules to determine the combined offense level. See Nguyen, 255 F.3d at 1344-45.

On appeal, the defendant advanced the government's position in this case, namely that the district court first should have grouped the offenses and then applied the downward departure to the combined offense level. The court of appeals disagreed, holding that the section 2A1.1, Application Note 1 departure was to be considered in the aforementioned step (b) base offense level determination. See id. at 1345. In other words, the court implicitly concluded that a departure identified in the commentary to an offense guideline is comparable to "specific offense characteristics, cross references, and special instructions" for purposes of U.S.S.G. S 1B1.1(b), and thus properly is considered in determining the base offense level before grouping. While the majority indicates that Nguyen does not dissuade it from concluding that Milan's argument is incorrect and notes that the Nguyen court addressed the issue in only a single paragraph, still the Nguyen ruling is

clear and I see no escape from a conclusion that by reaching our result we are creating a conflict between two circuits. Of course, as the majority points out, the conflict reflects an apparent rift between the United States Attorneys' offices in New Jersey and the Northern District of Georgia.10

Overall, I am satisfied that a section 2C1.7, Application Note 5 departure for systematic or pervasive corruption of a government function, like "specific offense characteristics, cross references, and special instructions," may be applied

_____

10. I do not doubt, however, that sophisticated defense attorneys reading the opinions here and in Nguyen will conclude that the actual rule is "heads, the government wins, tails the defendant loses."

to adjust only the base offense level of the specific, corruption-related offenses to which it applies. Thus, I believe that the district court erred when it applied the 3-level departure to a final combined offense level after applying the grouping methodology to multiple and disparate counts. Consequently, I dissent on this point.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit